**LA SALLE MACHINE TOOL, INC.**

v.

**MAHER TERMINALS, INC.**

**Civ. No. T–76–1911.**

United States District Court,
D. Maryland.

Feb. 8, 1978.

---

Francis J. Gorman and Semmes, Bowen & Semmes, Baltimore, Md., for plaintiff.

Robert H. Williams, Jr., and Niles, Barton & Wilmer, Baltimore, Md., for defendant.

THOMSEN, Senior District Judge.

In this action in which jurisdiction is based on diversity of citizenship, plaintiff La Salle Shipping Co. (La Salle) seeks to recover damages from defendant Maher Terminal, Inc. (Maher) for Maher's negligence in unloading from a truck to a staging area at Dundalk Marine Terminal a crate containing a component of an automatic piston line, manufactured and still owned by La Salle, which was to be shipped from Baltimore to a consignee in the Soviet Union. Maher does not seriously dispute the negligence of its employee, but seeks to limit to $500 its liability to La Salle, based upon: (a) the provisions of an ocean bill of lading issued after the accident by the

ocean carrier, covering other items sold by La Salle to the Soviet consignee, but not the item in question; or (b) the liability provisions in a tariff filed by Baltimore Marine Terminal Association, of which Maher is a member.

### Facts

More than a year before December 1974 La Salle, which is located in Warren, Michigan, received an order to manufacture an automatic piston line for V. O. Stankoimport of Moscow. The work was completed in the fall of 1974. Pursuant to a bilateral agreement between the United States and the Soviet Union with respect to the delivery of such purchases, Sovinflot, an agency of the Soviet Government, or its agent, Norton Lilly & Co., notified F. W. Myers, Inc. (Myers), La Salle's freight forwarder, located in Detroit, that the components of the piston line should be delivered to Dundalk Marine Terminal (Dundalk), in Baltimore, for transatlantic carriage on Baltic Shipping Company's (Balt-Atlantic's) vessel Walter Ulbricht. Dundalk is owned by Maryland Port Administration (MPA), an agency of the State of Maryland. MPA leases the piers, sheds and other areas therein to various terminal operators, including Maher.

La Salle or its agent Myers arranged to have the components of the piston line, packed in crates, delivered to Dundalk by Daily Express (Daily), a common carrier by truck. Two crates, including the one involved in this case (designated as B 062273 ⅝), which measured 11′ × 8′ × 136″ and weighed 31,050 lbs., were loaded onto one of Daily's trucks in Michigan on or about December 16, 1974, and reached Baltimore on December 18. Meanwhile, Norton Lilly had notified Myers that the Walter Ulbricht was not going to call at Baltimore, and that the crated machinery would be carried on another Balt-Atlantic vessel, the Novozybkov.

Norton Lilly did not tell La Salle or Myers the name of the terminal operator which would receive the shipment in question; Norton Lilly told them, and they in turn told Daily, to inquire at Dundalk's entrance gate where the crates should be delivered. When the truck carrying the two crates reached the gate, Daily's driver was told to go to Shed 6; when he arrived at Shed 6, an employee of Maher told the driver to deliver his load to a staging area (an outdoor storage area) located in the Dundalk terminal. At the staging area employees of Maher, pursuant to an agreement between Maher and Balt-Atlantic (of which neither La Salle nor Myers had any knowledge), proceeded to unload the truck. During the unloading, as a result of negligent handling by Maher's employees, the crate in question was dropped to the ground, seriously damaging its contents.[1] Shortly thereafter the crate was reloaded onto the truck and returned to La Salle's plant in Michigan.

No dock receipt or other receipt for the crate in question or its contents was ever given to La Salle, Myers or Daily by Maher, MPA, Balt-Atlantic or any agent or employee of any of them. The inland bill of lading covering the transportation of the two crates from Michigan to Baltimore was signed by Haskins, an employee of Maher, acknowledging receipt of the other crate, after the listing of the crate in question on the bill of lading had been scratched out. No paper referring to any tariff or limitation of liability was ever signed by anyone with respect to the crate in question. A bill in the amount of $135.64 for unloading the two crates was sent to Daily by MPA, which customarily sends bills in its name for all services performed by its lessees at Dundalk. That bill contained no reference to any tariff or limitation of liability.

After receiving notice that the crate had been damaged as aforesaid, Myers prepared an ocean bill of lading for the other crates, which was delivered to Norton Lilly in New

---

1. The parties stipulated that they would agree to the amount of damage, or offer evidence with respect thereto, before any judgment for plaintiff in excess of $500 is entered herein. Plaintiff claims $60,000 damages.

York on December 24, 1974, by Ventura, La Salle's import-export coordinator. The damaged crate was never listed on an ocean bill of lading. The undamaged crate which had been on the same truck was loaded onto the Novozybkov on December 27, 1974, along with 112 others; the ocean bill of lading was issued for those 113 crates. On the Summary Box Data Sheet used by Maher's employees while loading the vessel, the number designating the damaged crate had been scratched out.

Maher was a member of the Baltimore Marine Terminal Association (BMTA), an unincorporated association, authorized to issue tariffs under 46 U.S.C. 814, showing rates, charges, rules and regulations relating to the operation of its members at any of the terminals operated by the members of the Association. The members of the Association have changed from time to time and at least one other group operating in Baltimore Harbor issues tariffs under that statute. The BMTA tariff was filed with the Federal Maritime Commission (FMC). An agreement under 46 U.S.C. 814 (designed to avoid what might otherwise be antitrust violations) had been filed with and approved by the FMC in 1966. That agreement, however, made no reference to limitation of liability. The tariff containing the limitation of liability was neither approved nor disapproved by the Commission.

There is no evidence that La Salle or Myers ever saw a copy of the tariff, but the court finds that Myers, an experienced freight forwarder, knew or should have known that such tariffs existed. However, neither Sovinflot, Norton Lilly, MPA nor Maher had notified La Salle or Myers or any representative of either of them that the shipments originally destined for the Walter Ulbricht, and later destined for the Novozybkov, should be delivered to or would be handled by Maher, but had told them only that they should be delivered to Dundalk. La Salle and its agents were not charged with knowledge that the operator who would be thereafter designated was a member of BMTA, nor of the tariff provision upon which Maher now relies. It does not appear from the evidence that all terminal operators, individually or in association with others, file tariffs containing a similar limitation of liability for their own negligence. Moreover, La Salle and its agents had no adequate opportunity to negotiate with Maher in order to place a higher valuation on the contents of the crate in question.

The ultimate issues to be decided in this case are whether, in light of all the facts and the applicable law, Maher's liability to La Salle is limited to $500 under either (a) the provisions of the ocean bill of lading issued by Balt-Atlantic or its agent,[2] or (b)

2. The provision of the ocean bill of lading issued for the other crate was:

"In case of any loss or damage to or in connection with goods exceeding in actual value $500 lawful money of the United States, per package, or in case of goods not shipped in package, per customary freight unit, the value of the goods shall be deemed to be $500 per package or per unit, on which basis the freight is adjusted and the Carrier's liability, if any, shall be determined on the basis of a value of $500 per package or per customary freight unit, or pro rata in case of partial loss or damage, unless the nature of the goods and a valuation higher than $500 shall have been declared in writing by the shipper upon delivery to the Carrier and inserted in this bill of lading and extra freight paid if required and in such case if the actual value of the goods per package or per customary freight unit shall exceed such declared value, the value shall nevertheless be deemed to be declared value and the Carrier's liability, if any shall not exceed the declared value and any partial loss or damage shall be

adjusted pro rata on the basis of such declared value. The carrier shall not be liable for any consequential or special damage and shall have the option of replacing any lost goods and replacing or repairing any damaged goods.

"Whenever the value of the goods is less than $500 per package or other freight unit, their value in the calculation and adjustment of claims for which the Carrier may be liable shall for the purpose of avoiding uncertainties and difficulties in fixing value be deemed to be the invoice value, plus freight and insurance if paid, irrespective of whether any other value is greater or less.

"The limitation of liability and other provisions contained in this article shall inure not only to the benefit of the carrier, its agents, servants and employees, but also to the benefit of any independent contractor performing services including stevedoring in connection with the goods hereunder."

The breadth and applicability of the final provision will be discussed later in this opinion.

the provisions of the Baltimore Marine Terminal Association tariff.[3]

### Discussion

This is a diversity action, and for some, if not all, of the issues Maryland law applies. *Leather's Best, Inc. v. S. S. Mormaclynx,* 451 F.2d 800, 808 (2 Cir. 1971). Cf. *Kossick v. United Fruit Co.,* 365 U.S. 731, 81 S.Ct. 886, 6 L.Ed.2d 56 (1961). See also *Pine Street Trading Corp. v. Farrell Lines, Inc.,* 278 Md. 363, 369–70, 364 A.2d 1103 (1976); *Orient Overseas Line v. Globemaster Baltimore, Inc.,* 33 Md.App. 372, 386 n. 4, 365 A.2d 325 (1976). However, it makes little difference which law controls; the results reached herein would be the same under either law.[4]

### The Ocean Bill of Lading

■ The Carriage of Goods by Sea Act (COGSA), 46 U.S.C. 1301, et seq., particularly § 1304(5), does not itself limit the liability of stevedores, terminal operators or other agents of the carrier. *Herd & Co. v. Krawill Machinery Corp.,* 359 U.S. 297, 79 S.Ct. 766, 3 L.Ed.2d 820 (1959); but the parties to an ocean bill of lading may extend such provisions in a bill of lading to stevedores and terminal operators. *Herd v. Krawill,* supra; *Tessler Brothers (B.C.) Ltd. v. Italpacific Line and Matson Terminals, Inc.,* 494 F.2d 438 (9 Cir. 1974).

■ Bills of lading issued under COGSA have been held to be contracts of adhesion, to be construed strongly against the party who introduced the limitation of liability clause into the contract. *Cabot Corp. v. S.*

*S. Mormacscan,* 441 F.2d 476, 478 (2 Cir. 1971); *Scott & Williams, Inc. v. Pittston Stevedoring Corp.,* 422 F.Supp. 40, 43 (S.D. N.Y.1976); and earlier cases in the Supreme Court and other courts cited in those two cases. See also *Winterstein v. Wilcom,* 16 Md.App. 130, 293 A.2d 821 (1972), cert. den. 266 Md. 744. In *Cabot,* the court said:

"While there is no doubt that the parties to a bill of lading may extend a contractual benefit to a third party by clearly expressing their intent to do so, *Herd & Co. v. Krawill Machinery Corp.,* supra [359 U.S.] at 302, 79 S.Ct. 766, an intention to extend benefits of the limitation in the present bill to the stevedore would most naturally have been expressed by the addition of the term 'stevedore' to the long list of various persons included under the definition of 'carrier' in clause 2." 441 F.2d at 478.

■ The relevant provision in the ocean bill of lading relied on by Maher in the instant case read as follows: "The limitation of liability and other provisions contained in this article shall insure not only to the benefit of the carrier, its agents, servants and employees, but also to the benefit of any independent contractor performing services including stevedoring in connection with the goods hereunder." The phrase "any independent contractor performing services including stevedoring in connection with the goods hereunder" is not a model of clarity and is so broad as to be unreasonable. It might even include a trucker carrying a crate to the pier from anywhere in Maryland or Michigan, with whom the ocean carrier had no relationship.

---

**3.** The paragraph headed "Liability" in the tariff filed with FMC by the Baltimore Marine Terminal Association was as follows:

"The Terminal Operator shall be liable only for damage resulting from its failure to exercise due and proper care in performing the services and affording the facilities provided for herein. In no case shall the Terminal Operator be liable for a sum in excess of $500 per package or non-packaged objects unless the shipper, consignee, trucker, railroad, or other inland carrier, or their representatives, prior to the commencement of such services or use of such facilities, declares a higher value and pays to the Terminal Operator, in addition to the other charges for such services as herein set forth, a

premium computed at one percent (1%) of the declared value of each package or non-packaged object and in such event the Terminal Operator shall be liable for the full declared value of each such package or non-packaged object for damage resulting from its failure to exercise due and proper care in performing the services or affording the facilities provided for herein. The word 'package' shall include any van, container or other form of cargo unitization."

**4.** The parties are agreed that Maryland law is applicable, but defendant aptly suggests that "it must be applied with a maritime flavor."

In *Scott & Williams,* supra, the court said:

"Courts have, of course, held that parties may incorporate into their contract of carriage the terms of a bill of lading that has not yet issued, but these decisions rest on findings that the party against whom enforcement is sought was shown to have known or to have had a reasonable expectation that a particular bill of lading would issue. * * *" 422 F.Supp. at 43.

The cases cited in support of this statement deal with situations where the shipper was making a claim against the carrier, and the courts held that the shipper should have known that the party (the ocean carrier) with which it was dealing includes the clause protecting it from liability over $500. Those cases are different from the case at bar, where the limitation is being claimed by a terminal operator, of which the shipper had never heard, which gave no dock receipt or other evidence that the ocean bill of lading provisions were applicable, and which, by striking the case in question from the inland bill of lading, indicated that it was not treating that case as having been delivered to it as an agent or other representative of the ocean carrier.

It is not necessary in this case to decide whether a terminal operator unloading a crate from a truck away from the pier can ever have the benefit of a limitation of liability contained in an ocean bill of lading. In the case at bar, Maher is not entitled to rely on that provision in the ocean bill of lading which was issued for the 113 cases which were shipped on the Novozybkov; the case which its employee dropped was not included in that bill of lading or any other ocean bill of lading, and had been stricken from the inland bill of lading by defendant's employee.

### The Terminal Tariff

■ Maher also seeks to limit its liability under the tariff filed with FMC by BMTA, of which Maher is a member. Maher argues that the filing of a tariff with the Federal Maritime Commission by BMTA gave constructive notice to La Salle of the provisions of that tariff, including the provision dealing with limitation of liability. It appears to be the law that "such filing gives constructive notice only ' . . . of everything contained in such published tariff schedule which is by law required to be therein inserted. . . . '" *Federal Com. & Nav. Co. v. Calumet Harbor Terminals,* 542 F.2d 437, 441 (7 Cir. 1976), quoting from *Port of Tacoma v. S.S. Duval,* 364 F.2d 615, 617 (9 Cir. 1966), which in turn cited *Pacific S.S. Co. v. Cackette,* 8 F.2d 259, 260 (9 Cir. 1925), cert. den. 269 U.S. 586, 46 S.Ct. 203, 70 L.Ed. 426 (1925).

The statutory provision dealing with terminal tariffs does not refer to possible limitation of liability of a terminal operator. 46 U.S.C. 814. That section provides

"that tariff rates, fares, and charges, and classifications, rules and regulations explanatory thereof (including changes in special rates and charges covered by section 813a of this title which do not involve a change in the spread between such rates and charges and the rates and charges applicable to non-contract shippers) agreed upon by approved conferences, and changes and amendments thereto, if otherwise in accordance with law, shall be permitted to take effect without prior approval upon compliance with the publication and filing requirements of section 817(b) of this title and with the provisions of any regulations the Commission may adopt."

Title 46, C.F.R.—Shipping, Ch. IV, § 533.3 provides that

"Every person other than the Department of Defense, including the military department and all agencies of the Department of Defense, carrying on the business of furnishing wharfage, dock, warehouse, or other terminal facilities as described in § 533.1 * * * and warehousemen who operate port terminal facilities * * * shall file in duplicate with the Bureau of Domestic Regulation, Federal Maritime Commission, and shall keep open business inspection at all its places of business a schedule or tariff

showing all its rates, charges, rules, and regulations relating to or connected with the receiving, handling, storing, and/or delivering of property at its terminal facilities: * * * ." [5]

The statute (46 U.S.C. 814) and the regulation (46 C.F.R. 533.3) do not specifically require that any limitation of liability provision upon which a terminal operator intends to rely be included in its tariff (or the tariff of a group of which it is a member). La Salle argues that no constructive notice of such limitation was given by the filing with the FMC of the BMTA tariff.

■ It is not necessary, however, to decide that issue in this case. Neither La Salle nor its freight forwarder Myers had any notice that Maher or any other member of BMTA would be the terminal operator to which the crate should be delivered when it arrived at Dundalk. Indeed, when the inland carrier's driver arrived at Dundalk, he was simply told to go to Shed 6. Maher's employees there directed the driver to go to an open area at Dundalk, where Maher's employees negligently unloaded the crate in question and damaged it. La Salle had no actual or constructive notice that the limitation of liability provision in the BMTA tariff might be applicable nor any reasonable opportunity to arrange with Maher for a higher valuation to be placed on the crate.

In *The Majestic*, 166 U.S. 375, 386, 17 S.Ct. 597, 602, 41 L.Ed. 1039 (1897), the Court, speaking through Chief Justice Fuller, said: "We quite agree with Lord O'Hagan in *Henderson v. Stevenson* [L.R. 2 H.L. Sc 470], that 'when a company desires to impose special and most stringent terms upon its customers, in exoneration of its own liability, there is nothing unreasonable in requiring that those terms shall be distinctly declared and deliberately accepted'."

*Lichten v. Eastern Airlines, Inc.,* 189 F.2d 939 (2 Cir. 1951), cited by defendant herein, was an action for loss of jewelry contained in a bag which had been checked with defendant airline. A tariff filed by the airline with the appropriate agency and *deemed to have been approved by the agency* provided that the airline would not be responsible for loss of money, jewelry and other specified types of property included in a passenger's baggage. The passenger had purchased a ticket from the carrier and had completed her journey. The court held that these provisions became part of the contract between the passenger and the airline and barred recovery. That case is clearly distinguishable from the instant case, where La Salle was not charged with knowledge of the terminal operator with which he would be dealing.

More in point is *Tessler Bros. (B.C.) Ltd. v. Italpacific Line,* 494 F.2d 438 (9 Cir. 1974), where the court said, at page 443:

"A significant restriction on a carrier's right to limit liability to an amount less than the actual loss sustained is that the carrier must give the shipper 'a fair opportunity to choose between higher or lower liability by paying a correspondingly greater or lesser charge. . . .' *New York, New Haven & Hartford Railroad Co. v. Nothnagle,* 346 U.S. 128, 135, 73 S.Ct. 986, 990, 97 L.Ed. 1500 (1953); *Sommer Corp. v. Panama Canal Co.,* 475 F.2d 292, 298 (5th Cir. 1973), and cases cited therein. Clause 18 of the bill of lading in question provides that the $500 limitation exists 'unless the nature of the goods and a valuation higher than $500, shall have been declared in writing by the shipper upon delivery to the carrier and

---

5. The language in 46 U.S.C. 814 and the accompanying regulation may be contrasted with the language in 46 U.S.C. 844, dealing with "Intercoastal Shipping," which provides in pertinent part: "Every common carrier by water in intercoastal commerce shall file with the Federal Maritime Commission and keep open to public inspection schedules showing all the rates, fares, and charges for or in connection with transportation between intercoastal points on its own route; * * * The schedules * * *

shall also state separately each terminal or other charge, privilege, or facility, granted or allowed, and any rules or regulations which in anywise change, affect, or determine any part of the aggregate of such aforesaid rates, fares, or charges, or the value of the service rendered to the passenger consignor, or consignee, and shall include the terms and conditions of any passenger ticket, bill of lading, contract of affreightment, or other document evidencing the transportation agreement."

inserted in the bill of lading and extra freight paid if required. . . . ' Section 4(5) of COGSA, to which the bill of lading is expressly subject, has a similar provision.

"Tessler contends there is no evidence that the shipper was offered a choice of rates, one with the limitation and another without it. The provisions in the bill of lading and COGSA are prima facie evidence of the opportunity to avoid the limitation, however, and it is Tessler's burden to prove that such an opportunity did not in fact exist. *Petition of Isbrandtsen Co.,* 201 F.2d 281, 285 (2d Cir. 1953). Tessler did not carry this burden."

La Salle has carried that burden in this case.

Judgment will be rendered in its favor for such amount as may be agreed upon by the parties or proved at a later hearing.