**LA SALLE MACHINE TOOL, INC., Appellee,**

v.

**MAHER TERMINALS, INC., Appellant.**

**No. 78–1528.**

United States Court of Appeals, Fourth Circuit.

Argued Oct. 1, 1979.

Decided Dec. 20, 1979.

Robert H. Williams, Jr., Baltimore, Md. (Niles, Barton & Wilmer, Baltimore, Md., on brief), for appellant.

Francis J. Gorman, Baltimore, Md. (William M. Ferris, Semmes, Bowen & Semmes, Baltimore, Md., on brief), for appellee.

Before RUSSELL, Circuit Judge, FIELD, Senior Circuit Judge, and K. K. HALL, Circuit Judge.

K. K. HALL, Circuit Judge:

Plaintiff La Salle Machine Tool, Inc. [La Salle] brought this action, under federal diversity jurisdiction,[1] against Maher Terminals, Inc. [Maher], a terminal operator, for damages allegedly caused by Maher's negligence in unloading a crate of machinery components from a truck at Baltimore harbor. Maher did not seriously contest its negligence, and the parties stipulated La Salle's damages as $37,500. The primary question presented to the district court, and the sole issue on this appeal, is whether Maher is entitled to limit its liability to $500, under the terms of either its own terminal tariff or the standard bill of lading used by the ocean carrier which was to have taken the crate to its ultimate destination, the Soviet Union. The district court ruled against Maher, holding it liable for the full amount of damages. 452 F.Supp. 217 (D.Md.1978). We affirm.

### I.

In the fall of 1974, La Salle, a Michigan manufacturer, completed an order for an automatic piston line for delivery to a purchaser in the Soviet Union. Under the terms of a bilateral agreement between this country and the Soviet Union, the Baltic Shipping Company [Balt-Atlantic], an arm of the Soviet government, was designated as ocean carrier for the shipment. Details of the transport were arranged by Sovinflot, the Soviet government agency which acts as shipping agent for Balt-Atlantic, and by Norton, Lilly & Company [Norton-Lilly], the Soviets' agent in the United States. A Balt-Atlantic vessel, which was due in Baltimore harbor in late December, was selected to carry the shipment to Russia.

Norton Lilly notified La Salle's freight forwarder, F. W. Myers, Inc. [Myers], of the name and estimated arrival date of the vessel, and instructed La Salle to deliver the machinery to Shed 6 at the Dundalk Marine Terminal in Baltimore.

The carrier engaged defendant Maher to perform terminal operation services for the shipment, and to later perform the stevedoring operation. Neither La Salle nor

---

1. Although both parties agree the Maryland law applies for at least some of the issues in this case, see Leather's Best Inc. v. S. S. Mormaclynx, 441 F.2d 800, 807–808 (2d Cir. 1971), they both rely almost exclusively on federal cases. In view of the district court's conclusion that the same result would be reached under either Maryland or federal law, which neither party disputes, we find it unnecessary to determine whether state or federal law governs the particular issues on this appeal.

Myers was informed of the arrangements with Maher.

La Salle packed the components of the piston line in 114 separate crates, and contracted with a common carrier for delivery of the crates by truck to Dundalk. The truck containing the particular crate involved in this case arrived at Dundalk's Shed 6 on December 18, and was directed by a Maher employee to a nearby staging area. At the staging area, Maher's employees dropped the 31,000 pound crate while attempting to unload it from the truck.

A Maher employee acknowledged receipt of the December 18 delivery by signing the trucking company's inland bill of lading, after first striking out the bill's reference to the damaged crate. Maher did not issue a dock receipt for any part of the La Salle shipment.

The damaged crate was returned to Michigan for repair. The rest of La Salle's shipment was unloaded without incident, and sailed on the Balt-Atlantic vessel on December 29, 1974. A few days prior to sailing, while the ship was being loaded, an ocean bill of lading for the shipment was prepared by Myers on Balt-Atlantic's standard form, and was signed by Norton Lilly on behalf of the ship's master. The ocean bill listed the 113 crates which sailed on the ship, but made no reference to the damaged crate.

## II.

Maher contends that its liability for the damaged crate is limited by a clause in Balt-Atlantic's standard bill of lading which limits the carrier's liability to $500 per package, unless a higher value is declared by the shipper, and which provides that "[t]he limitation of liability . . . shall inure not only to the benefit of the carrier, its agents, servants and employees, but also to the benefit of any independent contractor performing services including stevedoring in connection with the goods hereunder."

Neither a bill of lading, nor a dock receipt incorporating its terms, was ever issued for the damaged crate. Nevertheless, Maher argues that since La Salle delivered the crate to Baltimore with the expectation that it would be shipped under the carrier's standard bill of lading, the terms of the Balt-Atlantic bill should apply. Maher relies on *Luckenbach Steamship Co. v. American Mills Co.*, 24 F.2d 704 (5th Cir. 1928), and a line of district court opinions decided under that case,[2] which hold that a carrier's liability for cargo damage may be limited by the terms of the carrier's standard bill of lading, even where the damage occurs before a bill is issued.

We believe that Maher's reliance on these cases is misplaced. The rationale underlying the cases is based on the shipper's presumed knowledge that a *carrier's* handling of cargo is, uniformly, subject to the conditions contained in the carrier's bill of lading, which serves as the contract of carriage.[3] When a shipper with this knowl-

---

**2.** *United States v. Central Gulf S. S. Co.*, 340 F.Supp. 473 (E.D.La.1972); *Berkshire Knitting Mills v. Moore-McCormack Lines, Inc.*, 265 F.Supp. 846 (S.D.N.Y.1965); *John Deere & Co. v. Mississippi Shipping Co.*, 170 F.Supp. 479 (E.D.La.1959); *Eastern Outfitting Co. v. Pacific Mail S. S. Co.*, 26 F.2d 270 (N.D.Cal.1928). See also *Baker Oil Tools, Inc. v. Delta Steamship Lines, Inc.*, 387 F.Supp. 617 (S.D.Tex.1974), aff'd 562 F.2d 938 (5th Cir. 1977) (*Luckenback* doctrine not applicable where carrier makes unilateral decision not to carry particular cargo before damages occurs).

**3.** *Luckenbach* was based on the theory that the carrier "was required by law to issue a bill of lading . . . . [The shipper] is presumed to know the law, and therefore must have known that the terms and conditions on which its goods were received and would be transported would be contained in a bill of lading to be issued later." 24 F.2d at 705. With the exception of *Eastern Outfitting, supra*, each of the decisions following *Luckenbach, see* n. 2, *supra*, was based upon the issuance by the carrier, at the time it accepted the goods, of a dock receipt specifically incorporating the carrier's standard bill of lading. *Eastern Outfitting* involved the enforceability of time limitations governing damage claims and suits, which were contained in a bill of lading issued after the cargo damage had occurred. The court, noting that "[o]n issuance of the bill of lading, the rights and liabilities of the parties were fixed thereby," (emphasis supplied) held that a suit brought three years after the bill was is-

edge delivers goods to the carrier's custody, the courts reasoned, he must be deemed to have accepted these conditions, absent some evidence to the contrary.

The claim in this case is against a terminal operator, functioning as an independent contractor and not as an agent of the carrier. Absent any proof that the relationship between such an independent contractor and the shipper is customarily governed by the carrier's bill of lading, and Maher has offered no such proof, we do not believe that the *Luckenbach* line of cases provides any support for Maher's position. The mere expectation that a particular bill will issue is not sufficient, by itself, to bind a shipper to terms purporting to establish the shipper's relationship with a third party.

Further, we are not convinced that the terms of the Balt-Atlantic bill would extend the liability limitation to Maher. While the parties to a bill of lading may extend a liability limitation to a third party, their intent to do so must be clearly expressed. The bill's terms "must be strictly construed and limited to intended beneficiaries, for they 'are not to be applied to alter familiar rules visiting liability upon a tortfeasor for the consequences of his negligence, unless the clarity of the language used expresses such to be the understanding of the contracting parties.'" *Herd & Co. v. Krawill Machinery Corp.*, 359 U.S. 297, 305, 79 S.Ct. 766, 771, 3 L.Ed.2d 820 (1959) (citations omitted). Maher contends that the bill of

lading's inclusion of "all independent contractors" in the listing of those to whom the liability limitation extends, clearly expresses an intent to include Maher's terminal operations within its scope.[4] We do not agree that the use of such a catch-all term satisfies the Supreme Court's insistence on "clarity of language." The Third Circuit addressed this issue, in a similar context, in *De Laval Turbine, Inc. v. West India Industries, Inc.*, 502 F.2d 259, 269–270 (3rd Cir. 1974):

[W]e deem the term "bailee" too general a category to support a limitation of liability. The mere fact that Catanach may fit within the descriptive term is not determinative. *See Cabot Corporation v. S. S. Mormacscan*, [441 F.2d 476 (2d Cir. 1971)] (denying a stevedore limited liability despite the fact that "carrier" was defined as "all persons rendering services in connection with performance of that contract"). Rather, there must be a specific link between the contract term and the party to be protected in order to satisfy the clarity requirement of *Herd & Company v. Krawill Company*. Absent such a link, courts cannot be confident that the contracting parties intended to extend COGSA protection. Given the substantial risks undertaken by a party who accedes to limitations of liability, we will not extend such limitations to third parties on the basis of mere speculation.

We agree with the Third Circuit's analysis, and with the district court's conclusion

---

sued was barred by the bill's 60-day limitation period.

4. Maher cites three cases holding that the phrase "any independent contractor" is sufficient to extend a bill's liability limitation to stevedores engaged in loading the ship. *Secrest Machine Co. v. S. S. Tiber*, 450 F.2d 285 (5th Cir. 1971); *Bernard Screen Printing Corp. v. Meyer Line*, 464 F.2d 934 (2d Cir. 1972); *Tessler Brothers, Ltd. v. Italpacific Line*, 494 F.2d 438 (9th Cir. 1974). However, the stevedore has historically been considered to occupy a special relationship with the carrier, *see, e. g., Seas Shipping Co. v. Sieracki*, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946), and his services in loading the ship fulfill the carrier's responsibility under the contract of carriage. We believe that the unique status of the stevedore in relation to the contract of carriage provides

cogent reasons to extend the bill of lading's protections to him. These reasons are not present in a case such as this one, involving a terminal operator performing a non-maritime function.

The only case cited by Maher which involves the coverage of a terminal operator under similarly general language in a bill of lading is *Hermann C. Starck, Inc. v. Finn Lines*, 1978 AMC 1330 (S.D.N.Y.). In holding that the terminal operator was entitled to limit its liability under a bill of lading clause extending to any "bailee" of the goods, the court emphasized that the terminal operator had been acting as agent for the carrier, and had issued a dock receipt specifying that its acceptance of the goods was subject to all the terms of the carrier's standard bill of lading.

that the language of the bill in this case, strictly construed as required by *Herd*, does not express a clear intent to extend the liability limitation to Maher's activities in unloading La Salle's shipment.

The language of the bill "is ambiguous because it does not indicate *whose* agents and independent contractors are meant." *Schiess-Froriep Corp. v. S. S. Finnsailor*, 574 F.2d 123, 127 (2d Cir. 1978). This ambiguity is crucial because, in unloading the trucks, Maher was not clearly acting as an independent contractor of the carrier. Although the carrier selected Maher to perform terminal operations for La Salle's shipment, the carrier played no further role in the transaction. All charges for Maher's unloading services were billed, by the Port Administration on behalf of Maher, to the trucking company for ultimate payment by La Salle. Regardless of whether the bill's language sufficiently expresses an intent to extend the liability limitation to an independent contractor performing services on behalf of the carrier, *compare, e. g., Rupp v. International Terminal Operating Co.*, 479 F.2d 674 (2d Cir. 1973) *with Tessler Brothers Ltd. v. Italpacific Line*, 494 F.2d 438 (9th Cir. 1974), we do not believe that it should be read so broadly as to extend to a contractor performing work on behalf of the trucking company or shipper. *Cf. Schiess-Froriep, supra; Cabot Corp. v. S. S. Mormacscan*, 441 F.2d 476 (2d Cir. 1971); *Cosa Export Co., Inc. v. Transamerican Freight Lines, Inc.*, 1968 AMC 1351 (N.Y. Sup.Ct.).

We conclude that Maher's claim to liability limitation, based on a bill of lading which was never issued or incorporated in a dock receipt and which did not clearly extend its protection to Maher in any event, was properly rejected by the district court.

### III.

■ Maher also claims that its liability is limited to $500 under the terms of a tariff filed with the Federal Maritime Commis-

sion by the Baltimore Marine Terminal Association [BMTA], an unincorporated association of terminal operators of which Maher is a member. The district court rejected this argument, finding that "[n]either La Salle nor its freight forwarder Myers had any notice that Maher or any other member of the BMTA would be the terminal operator to which the crate should be delivered when it arrived at Dundalk . . . . La Salle had no actual or constructive notice that the limitation of liability provision in the BMTA tariff might be applicable nor any reasonable opportunity to arrange with Maher for a higher valuation to be placed on the crate." 452 F.Supp. at 223. We believe that these findings by the district court are fully supported by the record in this case, and are determinative of the issue.

It is undisputed that La Salle had no actual notice that the BMTA tariff might be applicable. La Salle was told only to deliver its shipment to Dundalk's Pier 6. Maher's own witnesses testified that a number of terminal operators worked out of this pier, and that not all of them were members of the BMTA. When the shipment arrived at the pier, Maher made no attempt to identify itself or to give notice that its receipt of the goods was subject to any special conditions.

■ Nor is there any basis for imputing constructive knowledge of the tariff's provisions to La Salle. Maher argues that the filing of the tariff with the FMC gave the public constructive notice of the liability limitation contained in it. But it is well established that the filing of· a tariff gives constructive notice only of those terms which are required by law to be filed. *E. g., Federal Commerce & Navigation Co., Ltd. v. Calumet Harbor Terminals, Inc.*, 542 F.2d 437 (7th Cir..1976). Nothing in the Shipping Act of 1916, 46 U.S.C. § 801 *et seq.*, or in the applicable regulations, 46 C.F.R. § 533.3, requires a terminal operator to file provisions limiting its liability.[5]

---

5. Maher argues that it is required by law to file the rates it charges, and that the rates are dependent upon its enforcement of the liability limitation. Therefore, it contends, the liability limitation is actually a part of its rate structure and its filing is required by law. We see no merit to this argument, which could as easily apply to any factor affecting Maher's cost of doing business.

Further, as the district court noted, knowledge of the tariff's terms is not enough to bind a shipper who has no reason to believe that the particular tariff even applies. Maher presented no evidence that similar liability limitations were customary at Dundalk or in the trade generally; despite the district court's specific inquiry on this point.

Maher argues that La Salle should be bound by the tariff's terms because a "reasonable inquiry" by La Salle would have revealed (a) that Maher would be handling its shipment, (b) that Maher was a member of the BMTA, (c) that the BMTA had adopted a tariff which included a liability limitation, and (d) that La Salle could obtain higher coverage by paying an additional premium to Maher. We believe that this argument misses the point. The question here is not what a reasonable inquiry by La Salle might have revealed. The sole issue is whether the BMTA tariff provisions constituted an express or implied agreement between La Salle and Maher "to alter familiar rules vesting liability upon a tortfeasor for the consequences of his negligence." *Herd, supra,* 359 U.S. at 305, 79 S.Ct. at 771. We agree with the district court that the facts of this case provide no basis for finding such an agreement.

We conclude that neither the Balt-Atlantic bill of lading nor the BMTA tariff was effective to limit Maher's liability in this case. Accordingly, we affirm the order of the district court granting judgment for La Salle in the full amount of its damages.

AFFIRMED.