**GEBR. BELLMER KG., Plaintiff,**

**v.**

**TERMINAL SERVICES HOUSTON, INC., et al., Defendants.**

**Civ. A. No. H–79–191.**

United States District Court,
S. D. Texas,
Houston Division.

Sept. 9, 1981.

William C. Bullard, Houston, Tex., for plaintiff.

G. Byron Sims, Eugene J. Silva, Houston, Tex., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

NORMAN W. BLACK, District Judge.

This cargo damage case was tried to the Court for three days beginning July 6, 1981. At the conclusion of Plaintiff's evidence, the Court granted judgment in favor of Defendant Biehl & Company. Upon consideration of the pleadings, evidence, depositions, and post-trial memoranda, the Court makes the following findings of fact and conclusions of law:

### Findings of Fact

1. On or about September 6, 1978, the Plaintiff, Gebr. Bellmer KG ("Bellmer") shipped C.I.F. from Hamburg to Houston on board the SS LUDWIGSHAFEN two waste water treatment machines with accompanying appurtenances, known as Bellmer Winklepressen, for ultimate destination to its customer Ralston Purina Company in Pryor, Oklahoma, through Bellmer's U. S. Broker, Ashbrook Simon Hartley, Inc. of Houston, Texas ("Ashbrook").

2. The Winklepressen were manufactured by Plaintiff at its factory in Niefern, Federal Republic of Germany. They were transported to Hamburg, Germany, and crated and secured on a container flat, No. HLCU 466–12–16, by independent contractors of Bellmer. The container flat was owned or leased by Hapag-Lloyd, the owner of the SS LUDWIGSHAFEN.

3. The Winklepressen were then transported by the SS DUSSELDORF EXPRESS to Bremerhaven, Germany and loaded on board the SS LUDWIGSHAFEN.

4. It is agreed by all parties that a clean bill of lading was issued on the cargo.

5. The SS LUDWIGSHAFEN arrived in the Port of Houston at City Dock No. 27 on September 20, 1978, having as her husbanding agents Defendant and Cross-Plaintiff Biehl & Company ("Biehl").

6. Biehl notified Defendant Young & Co. ("Young") of the ship's arrival; an employee of Young telephoned Defendant Terminal Services Houston, Inc. ("TSHI").

7. On the evening of September 20, 1978, the unloading of cargo from the SS LUDWIGSHAFEN was undertaken by Young and TSHI in cooperation with Biehl personnel. Young personnel performed the stevedoring chores of removing the cargo from the ship and placing it on trailers. However, the Paceco crane used to lift the containers was leased from TSHI, and TSHI also provided the crane operators (Deposition of Lance Miller, p. 12). Other employees of TSHI, driving yard-hustler-type trucks, brought trailers to the ship and positioned them to receive the cargo. The stevedores were responsible for placing and securing the cargo on the trailers. Biehl personnel would then instruct the driver to which staging area to take each piece of cargo.

8. At some time around 3:00 a. m. on September 21, John Arthur Green, one of TSHI's most experienced and reliable drivers, parked the TSHI-owned chassis which he had been using, and, per instructions received through Young & Co., picked up a road-type chassis owned by Hapag-Lloyd.

9. Mr. Green was driving a double-axle "yard hustler" of the type normally used for movement around the pier area of larger and heavier container loads.

10. Green positioned the chassis under container No. HLCU 466–12–16, according to the directions given by the stevedores.

11. The container was set down on the rear beam of the chassis with the corner castings over two 4-inch projections known as twist-locks, and with the notch in the forward transverse beam of the container engaged over the "gooseneck" of the trailer chassis.

12. In accordance with the usual practice in the Port of Houston, the stevedore employees did not engage the locking devices which are used on the highway to hold the front and rear corner castings of the container to the corners of the chassis.

13. The trial testimony established that the trailer chassis used for container flat No. HLCU 466–12–16 was suitable to transport this particular container, and that the container flat was properly placed on the trailer chassis. After the container flat was placed on the chassis, neither Young & Co. personnel nor Mr. Green perceived any unsteadiness or instability in the load.

14. An employee of the vessel's agent, Defendant Biehl & Co., signaled Mr. Green that the load was secured on the chassis, told him to take the container to marshalling area 29A, and cautioned him to drive only in first gear.

15. Yard 29A is the area in which oversized container loads are placed at the disposal of inland carriers or other agents of the consignee. It is at this point that they leave the custody of the carrier. Mr. Green had delivered similar-appearing loads to Yard 29A before, including one somewhat smaller load that same night.

16. The load secured on the container flat consisted of four crates. At each end of the container was a large crate, approximately 12 feet 6 inches high by 12 feet long, and 10 feet 8 inches wide. Two smaller crates sat in between the larger ones. The total weight of the four crates was approximately 60,000 pounds.

17. The container flat for these four crates was 40 feet long and eight feet wide. The container itself weighed 9200 pounds. Thus total weight of the crates and container was approximately 70,000 pounds or 35 tons. When sitting on the Hapag-Lloyd chassis, the container flat had a total height of approximately 18 feet 6 inches.

18. All witnesses agreed that this would be considered an over-height and over-width load. A standard container is 8 feet high and 8 feet wide.

19. There were no external markings on the crates or the container other than the approximate total weight; but the unusual height and width was obvious.

20. It is not customary for such loads to have their center of gravity indicated on the crating or packaging.

21. Although Young & Co. specified which chassis was to be used, and directed Green in the positioning of the chassis under the container flat, the testimony made it abundantly clear and all parties are now agreed that Mr. Green was at all times under the supervision and direct control of only TSHI. Only TSHI paid his wages, made his assignments, and had the right to replace him. After the container was secured onto the chassis, Young & Co. had no authority over Green's route to the marshaling yard or his manner of driving. The Court finds that John Arthur Green was not the borrowed servant of Young & Co.

22. Since it is now agreed that the chassis was suitable, the container was properly positioned, no instability or tilting was observed, and Green was not Young's borrowed servant, Defendant Young was not negligent in any way.

23. After being signalled his load was secured, Mr. Green drove slowly down the pier, negotiating one 90° turn to the right, two 90° turns to the left, and crossing a railroad track along his route to Yard 29A. He ascended a slight grade and began a right-angle turn to the right into an entrance to Yard 29A. The narrow entrance to the yard was formed by other cargo parked on each side.

24. At this location, the entrance slopes left to right across the direction in which the truck was proceeding, at a grade of about 3 per cent.

25. This was the only entrance to Yard 29A available at this time. Other possible entrances were blocked with parked cargo.

26. As he looked in his rear-view mirror to see whether the right side of his trailer would clear the cargo parked to the right, Mr. Green heard the sound of cracking wood and observed his load beginning to topple off the chassis to the right.

27. It appearing that the top of the load was going to hit the cab, Mr. Green testified that he began instinctively to turn his wheels to the left, away from the falling mass.

28. The testimony of TSHI's expert Dr. James Bernard, assoc. professor of mechanical engineering at Michigan State University, and the photographs of the scene of the accident indicate that in fact the wheels moved very little from the position in which they were when the load began to fall.

29. The load landed on the pavement to the rear and right side of the truck, about 400 yards from the starting point, severely damaging the cargo.

30. Defendant TSHI has attempted to raise the issue of inherent vice or latent defect by alleging the center of gravity in this cargo load was off-center and that this caused the container to topple off the chassis. Three witnesses speculated this was a cause of the accident. Tommie R. Johnston, a marine surveyor, who surveyed the damaged cargo and saw photographs of the accident, gave his opinion that it was caused by excessive speed and a top-heavy load. Boyce Irwin, TSHI's yard manager who viewed the scene of the accident, also said he believed the accident was caused by the center of gravity being too high. Dr. James Bernard, TSHI's expert witness, who saw photographs of the accident scene, stated at trial that he believed the too-high center of gravity made the load unstable. However, in an earlier report he also referred to the truck making a sharp right turn.

31. It is undisputed that the cargo in question had previously sustained being transported from Niefern to Hamburg, loaded onto a ship for carriage from Hamburg to Bremerhaven, off-loaded and then loaded onto the SS LUDWIGSHAFEN. It was off-loaded in Houston, and sustained a ride involving three previous turns and crossing railroad tracks, uneventfully.

32. The witnesses testified there was no evidence of unsteadiness or leaning of the load when placed on the chassis in Houston.

33. Ashbrook has purchased and imported between fifty and sixty Winklepressen similarly crated, without incident.

34. Bellmer has shipped a total of approximately 250 Winklepressen crated in a similar manner, without experiencing this type of accident.

■ 35. Therefore, the Court finds that the bulk of the evidence indicates the load was sufficiently stable to sustain a normal turn into Yard 29A. TSHI has not persuaded the Court that the load was top-heavy or that the center of gravity was significantly off.

36. Three stevedore employees of Young & Co. went to the scene of the accident immediately after it occurred. One did not testify as to the cause of the accident, but Lance Miller, the stevedore superintendent on the night of the accident, and Elmer Motem, the ship walking foreman, both said it appeared to them that the driver had attempted too sharp a turn. Mr. Motem also thought speed was a factor.

37. TSHI submitted its invoice to Young & Co. and was paid by Young & Co. from funds provided by Biehl.

38. There was testimony as to the frequent disregard of corporate formalities between Biehl & Co. and Young & Co., in the transaction of business at both their World Trade Building offices and at the port.

39. TSHI's owners represent various steamship lines and stevedoring companies in the Houston ship channel area. Its principal business is the marshaling of ocean containers in a holding area where the containers await loading onto a ship or delivery to the consignee. TSHI is usually employed directly by the steamship line or the ship's agent. (Deposition of Boyce Irwin, p. 11).

■ 40. The Court finds that in actuality TSHI was an independent contractor of the carrier, employed by the ship's agent Biehl & Co., to perform the usual marshaling services in connection with unloading the cargo and readying it for customs inspection and delivery to the consignee's road carrier. In making this determination the Court has carefully considered the customary procedures and legal entities involved in unloading an ocean carrier's cargo in the process of effecting the carrier's "delivery," and compared these with the underlying reality and interrelationships of the various legal entities, management personnel and laborers who handled the container in this case. As one witness so understatably said, "I think this thing is not so organized as you think it might be." (Deposition of Lance Miller, stevedore superintendent for Young & Co., page 59.)

### Conclusions of Law

1. This Court has jurisdiction in this case under 28 U.S.C. § 1332 and 28 U.S.C. § 1333.

A. *Liability.*

■ 2. A clean bill of lading constitutes a prima facie case that the goods were delivered in good condition to the carrier. The carrier, its servants, or agents then have the burden of proving they exercised due diligence to prevent damage, or that the harm was occasioned by a COGSA exception. *See Calmaquip Eng. West Hemisphere v. West Coast Carriers*, 650 F.2d 633 at 639–41 (5th Cir. 1981), citing *Blasser v. Northern Pan American Line*, 628 F.2d 376, 381 (5th Cir. 1980).

■ 3. To the extent this cause of action between Bellmer and TSHI for damage occurring on land is governed by the law of the forum, as opposed to maritime law, *see Leather's Best, Inc. v. SS Mormachynx*, 451 F.2d 800, 808 (2d Cir. 1971), TSHI was a bailee of the cargo and Bellmer is entitled to a presumption of negligence and has established a prima facie case of liability against TSHI who had actual custody of the cargo when it was damaged. *Buchanan v. Byrd*, 519 S.W.2d 841 (Tex.1975). *Sanroc Co. Intern. v. Roadrunner Transp., Inc.*, 596 S.W.2d 320 (Tex.Civ.App.—Houston [1st] 1980).

■ 4. If the carrier or his independent contractor as bailee of the cargo raises the COGSA exception to liability of inherent vice or latent defect in the cargo, such

carrier or independent contractor has the burden of proving this defense. *Harbert Intern. Establ. v. Power Shipping*, 635 F.2d 370 (5th Cir. 1981). *Blasser, supra.*

5. Defendant TSHI did not establish that the center of gravity of this cargo was probably off-center.

6. There was no evidence of negligence on the part of Young & Co. Defendant Young & Co. is not liable to Bellmer.

■ 7. Defendant TSHI did not rebut Bellmer's prima facie case and is liable to Bellmer for the damage to the cargo.

B. *Amount of Liability.*

1. Paragraph 2a of the bill of lading expressly provided that the U.S. Carriage of Goods by Sea Act (COGSA), 46 U.S.C. § 1300 *et seq.*, shall govern while the goods were in the custody of the carrier after discharge in ports of the United States.[1]

■ 2. The validly filed tariff, Continental/U.S. Gulf Freight Association, Tariff No. 5—F.M.C. Tariff No. 5, effective 20 February 1978, is the law promulgating the applicable standard controlling the bill of lading. *Brown & Root, Inc. v. M/V Peisander*, 648 F.2d 415, 421 (5th Cir. 1981).

■ 3. Paragraph 4 of the Tariff[2] and Clause 19 of the bill of lading[3] constitute prima facie evidence that the shipper had an opportunity for a choice of rates and to declare a higher valuation on his cargo. *Peisander* at 424. COGSA does not prescribe that the face of the bill of lading contain a specific space or blank in which the increased valuation is to be inserted.

1. "RESPONSIBILITY AND JURISDICTION

2. a) If this bill of lading is issued exclusively for the carriage of goods by sea, the carrier shall be responsible subject to the provisions of any legislation which incorporates the Hague Rules contained in the international convention for the Unification of Certain Rules Relating to Bills of Lading dated Brussels August 1924, and which are compulsory applicable to the contract of carriage contained herein and which will be for shipments from Belgian ports. Article 91., Book II, Title II of the Belgian Commercial Code. If no such provisions are compulsory applicable the Hague Rules contained in the said international convention as enacted in Germany or in Holland shall apply according to the place where the main office of the actual carrier is situated. *The carrier shall not be liable in any capacity whatsoever for any delay, loss of or damage to the goods before the goods enter the ship's tackle to be loaded or after the goods leave ship's tackle to be discharged, transshipped, or forwarded, but the U. S. Carriage of Goods by Sea Act of 1936 shall govern while the goods are in the custody of the carrier after discharge in ports of the USA.*" (Emphasis added.)

2. "4. CHOICE OF RATES.

Except for the articles for which in this tariff ad valorem rates are stipulated this tariff offers shippers a choice of freight rates, dependent upon whether the shipment is made subject to bill of lading limit of value, or at higher limit of value, or in some cases at a specified lower limit of value. The rates shown in this tariff, except were predicated on specially lower value, or at an ad valorem basis, are subject to bill of lading limit of value. If the shippers elect to ship at a value in excess of bill of lading limit of value, they shall, in writing, declare the value before shipment, and the rates applicable, unless already shown as ad valorem, will be the tariff rates, plus two per cent of the value declared.

If the valuation in excess of the bill of lading limit of value is not declared by the shippers, in writing, before shipment, as the basis of freight, such non-declaration shall constitute an election by the shippers to ship on the basis of said bill of lading limit of value and any liability of the shipowner shall be computed on such basis in the manner provided in the bill of lading."

3. "ADJUSTMENT OF CLAIMS":

"In the case of any loss of or damage to or delay to or in connection with the goods, their value in the calculation of adjustment of claims for which the carrier may be liable shall be deemed to be the invoice value plus freight and insurance if paid, unless the nature of the goods and a valuation higher than the amount aforementioned have been declared in writing by the shipper upon delivery to the carrier and inserted in the bill of lading and extra freight paid if required. If in such case the actual value of the goods per package or unit shall exceed such declared value, the value shall nevertheless be deemed to be the declared value and the carrier's liability, if any, shall not exceed the declared value. Any partial loss or damage shall be adjusted pro rata on the basis of the applicable value. The carrier shall not be liable for consequential or special damage and shall have the option of replacing any lost goods."

Plaintiff did not sustain its burden to prove that in fact an opportunity to choose a higher valuation did not exist. *See Peisander, id.,* citing *Pan Am. World Airways v. California Stevedore and Ballast Co.,* 559 F.2d 1173, 1176 (9th Cir. 1977). Therefore, the limitation of liability under this bill of lading is not void.

 4. The language of Clause 19 of the bill of lading referring to "invoice value" is not a waiver of COGSA § 4(5), 46 U.S.C. § 1304(5), and is superseded by COGSA by virtue of the provisions of paragraph 2(a) of the bill of lading making the terms of COGSA controlling. *See Otis McAllister & Co. v. Skibs, a/s Marie Bakke,* 260 F.2d 181 (9th Cir. 1958), *cert. denied,* 359 U.S. 915, 79 S.Ct. 584, 3 L.Ed.2d 576 (1959).

5. Therefore, the liability of the carrier, its servants, agents, or independent contractors is limited to $500 for each package.

6. This cargo consisted of four COGSA packages. *Allstate Ins. Co. v. Inversiones Navieras Imparca, C.A.,* 646 F.2d 169 (5th Cir. 1981).

 7. Paragraph three of the bill of lading,[4] "Responsibilities of Servants and Agents," extends the carrier's $500 per package limitation of liability to Defendant TSHI as the carrier's independent contractor. Such extension of the carrier's limitation was within the contemplation of the parties to the bill of lading, as evidenced by the clause in Paragraph 2a which extended the coverage of COGSA in U.S. ports from the ship's tackle to the point at which the goods are made available to the agent of the consignee or inland carrier for delivery. The specific tasks performed by TSHI were but a part of the process of unloading the carrier's cargo and placing it where it could be inspected by customs officials and picked up by the consignee or his agent, according to customary and usual procedures in U.S. ports. The applicability of the limitation clause of the bill of lading should not vary because the very same tasks are performed by two legal entities instead of just one. *See, e. g., Elgin National Industries, Inc. v. S.S. Weser Express,* 1973 A.M.C. 1404 (S.D. N.Y.1973) (terminal operator benefitted from $500 limitation in bill of lading clause identical to one *sub judice* ). *Cf. Bernard Screen Printing v. Meyerline,* 464 F.2d 934 (2d Cir. 1972), *cert. denied,* 410 U.S. 910, 93 S.Ct. 966, 35 L.Ed.2d 272 (1973) (company which performed both stevedoring and terminal operating functions benefitted under clause extending carrier's limitation to independent contractors); *Leather's Best, Inc. v. S.S. Mormaclynx,* 451 F.2d 800 (2d Cir. 1971) (limitation extended to terminal operator); *Elgie & Co. v. S.S. S.A. Nederburg,* 1976 A.M.C. 2446 (S.D.N.Y.1976) (company that performed both stevedoring and terminal storage functions entitled to benefit from carrier's limitation clause as independent contractor). *Distinguish, LaSalle Machine Tool, Inc. v. Maher Terminals, Inc.,* 611 F.2d 56 (4th Cir. 1979) (terminal operator performing service of unloading from an inland carrier *prior* to ocean shipping held to be performing work on behalf of the trucking company, and thus not covered by the ocean carrier's bill of lading).

8. The bill of lading Paragraph 3 extending the carrier's limitation of liability to independent contractors who performed services in connection with the loading and unloading of cargo, when coupled with Clause 2a's provision that COGSA shall govern while the goods were in the carrier's custody after discharge in U.S. ports, are a

---

4. "RESPONSIBILITY OF SERVANTS AND AGENTS.

No. 3. It is hereby expressly agreed that to the extent of the stipulation in this cause the carrier shall be deemed to be acting as agent on behalf of or trustee for the benefit of all other persons named in this clause and that the servants, employees and agents of the carrier shall not be liable whether in contract or in tort in their present capacity for any loss of or damage or delay of the goods whatsoever and wheresoever arising and that without prejudice to the foregoing every exemption, limitation, liberty and immunity, whether printed, written or incorporated by reference which under this bill of lading contract apply to the carrier, shall in all respects enure also for the benefit of the servants, employees and agents of the carrier as well as such independent contractors, including their servants, employees and agents, whose services the carrier from time to time may engage in the operation of the vessel or any other means of transportation including loading, discharging, and all services in connection herewith."

sufficiently clear statement of such extension. *Secrest Machine Corp. v. S.S. Tiber,* 450 F.2d 285 (5th Cir. 1971).

9. Defendant TSHI may benefit from the carrier's bill of lading limitation of liability to $500 per package.

*Summary*

The Court finds

1. Bellmer has made a prima facie case against Defendant TSHI, which is supported by the evidence in this case.

2. TSHI has not established any inherent vice or latent defect in the cargo nor refuted Bellmer's prima facie case.

3. Therefore, TSHI is liable to Bellmer for the damage to the cargo.

4. However, as an independent contractor of the carrier, assisting the carrier in carrying out its duty of good delivery, TSHI is an express beneficiary of the bill of lading, and its liability is limited to $500 per COGSA package.

5. TSHI is liable to Bellmer in the amount of $2,000.

In the event that any of the foregoing findings of fact also constitute conclusions of law, they are adopted as such. In the event that any of the foregoing conclusions of law also constitute findings of fact, they are adopted as such.