724 F.2d 313
 1984 A.M.C. 305, 37 UCC Rep.Serv. 864
 COLGATE PALMOLIVE COMPANY, Plaintiff-Appellant,
v.
S/S DART CANADA, her engines, boilers, tackle, etc., Dart
Containerline Ltd., Global Terminal & Container
Services, Inc., Lansdell Protective
Agency, Inc., Defendants,
Global Terminal & Container Services, Inc., Defendant-Appellee.
LANSDELL PROTECTIVE AGENCY, INC., Defendant-Third-Party-Plaintiff,
v.
AETNA CASUALTY & SURETY CO., Third-Party Defendant.
 No. 24, Docket 83-7261.
 United States Court of Appeals,
Second Circuit.
 Argued Sept. 22, 1983.
Decided Dec. 14, 1983.
 
 Harold M. Kingsley, New York City, for plaintiff-appellant.
 Charles G. Herbermann, Jr., New York City (McDonald & Herbermann, New York City, of counsel) for defendant-appellee.
 Before LUMBARD, OAKES and VAN GRAAFEILAND, Circuit Judges.
 LUMBARD, Circuit Judge:
 
 
 1
 Plaintiff Colgate Palmolive Company ("Colgate") sued to recover the full value of lost oil drums scheduled to be shipped to France. It now appeals from a judgment of the Southern District of New York denying Colgate's motion for summary judgment and granting defendant Global Terminal and Container Services, Inc.'s cross-motion to limit its liability to $500 per missing package, pursuant to the Carriage of Goods by Sea Act (COGSA), 46 U.S.C. 1304(5) (1976).[1] For the reasons set forth below, we reverse and direct entry of judgment for Colgate in the amount of $116,459.24.
 
 
 2
 The relevant facts are undisputed. On August 22 and 27, 1979, Colgate delivered a total of 22 drums of spearmint oil to Global Terminal & Containers Services, Inc.'s (Global) terminal in Jersey City, New Jersey. The oil was scheduled to be shipped to LeHavre, France.[2] Global had contracted with Dart Containerline Ltd. (Dart) to store the goods until it loaded them aboard Dart ships. Sixteen of these drums were never loaded aboard vessels, and have never been located. Global has offered no explanation for their disappearance.
 
 
 3
 Global issued dock receipts showing that it received all 22 drums. These receipts explicitly state, in bold type, that they incorporate all terms of the bills of lading issued by Dart.[3] By its terms, COGSA applies only from the time when the goods are loaded on shipboard to the time they are discharged from the ship. 46 U.S.C. 1301(e) (1976). The bills of lading, however, each contain a provision that extends application of COGSA to the period "before loading" and "after discharge." One of COGSA's provisions limits the carrier's liability to $500 per package, unless otherwise agreed. 46 U.S.C. 1304(5) (1976).
 
 
 4
 Colgate sued Dart under admiralty jurisdiction, and joined Global as a defendant under pendent jurisdiction.[4] Judge Duffy held valid the clause in Global's dock receipts which incorporated Colgate's agreement in the bill of lading to be bound by COGSA before loading and after discharge. He concluded that since the loss occurred before loading, COGSA's liability limitation applied. Declaring that "plaintiff's argument that the loss of the oil is governed by state law is totally unavailing," he denied Colgate's motion for summary judgment and granted Global's cross-motion to limit its liability to $500 per package, or $8,000.
 
 
 5
 We disagree with the district court. Parties may contractually extend COGSA's application beyond its normal parameters. When they do so, however, COGSA does not apply of its own force, but merely as a contractual term. In this case, state law, the law of New Jersey, governs and invalidates the contractual limitation of liability upon which Global relies.
 
 
 6
 The district court cites our decision in Bernard Screen Printing Corp. v. Meyer Line, 464 F.2d 934 (2d Cir.1972), cert. denied, 410 U.S. 910, 93 S.Ct. 966, 35 L.Ed.2d 272 (1973), for the proposition that contractual extensions of COGSA are valid. In that case, we approved contractual provisions in a bill of lading that extended to stevedores the $500 liability limitation enjoyed by carriers. We discussed Herd & Co. v. Krawill Machinery Corp., 359 U.S. 297, 301-03, 79 S.Ct. 766, 769-70, 3 L.Ed.2d 820, in which the Supreme Court held that although COGSA's liability limitation provision did not apply to agents of a carrier, the parties were not precluded from contracting to such limitation. Accord, Carle & Montanari, Inc. v. American Export Isbrandtsen Lines, 275 F.Supp. 76 (S.D.N.Y.), aff'd mem. 386 F.2d 839 (2d Cir.1967), cert. denied, 390 U.S. 1013, 88 S.Ct. 1263, 20 L.Ed.2d 162 (1968).
 
 
 7
 Having said that nothing in COGSA or its legislative history precludes parties from agreeing to extend its coverage to situations other than those where it would normally apply, it does not follow that any such resulting contractual provision is necessarily valid. In Pannell v. U.S. Lines Co., 263 F.2d 497, 498 (2d Cir.1959), COGSA was incorporated into a bill of lading. We stated that "[w]here a statute is incorporated by reference its provisions are merely terms of the contract evidenced by the bill of lading." That being so, we favored a specific definition of the term "package" that appeared in the bill of lading over an inconsistent definition in COGSA. This rule has been followed consistently by other circuits. See North River Insurance Co. v. Fed Sea/Fed Pac Line, 647 F.2d 985, 989 (9th Cir.1981) (foreign jurisdiction clause valid when COGSA applies only as contract term); Ralston Purina Co. v. Barge Juneau & Gulf Carribean Lines, 619 F.2d 374, 375 (5th Cir.1980) (parties' agreement to one year limitation on suit prevails over COGSA provision); Commonwealth Petrochemicals Inc. v. S/S Puerto Rico, 607 F.2d 322, 325 (4th Cir.1979) (specific definition of "package" in bill of lading controls over definition in COGSA); P.P.G. Industries, Inc. v. Ashland Oil Co., 527 F.2d 502, 507 (3d Cir.1975) (parties could have extended, but neglected so to do, COGSA's statute of limitations provision to agent of carrier).
 
 
 8
 Thus, in this case COGSA does not apply of its own force as a statute, but merely as a contractual term in the bill of lading. We disagree with the district court's assertion that state law is "totally unavailing." We see no reason to deviate from our holding in Leather's Best v. S.S. Mormaclynx, 451 F.2d 800, 808 (2d Cir.1971), that an action against a terminal for negligent loss of cargo is not within federal maritime jurisdiction, but is a state claim governed by state law. Since state law governs, provisions of COGSA incorporated by contract can be valid only insofar as they do not conflict with applicable state law.[5]
 
 
 9
 In deciding this pendent claim, of course, the district court must act in the same manner as would a New York state court, Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), and this rule applies to conflicts rules as well, Klaxon Co. v. Stentor Electric Co., 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941). Here, plaintiffs allege that the oil was lost due to defendants' negligence. Since the loss occurred in New Jersey, a New York court would apply New Jersey law. Babcock v. Jackson, 12 N.Y.2d 473, 483, 240 N.Y.S.2d 743, 750-51, 191 N.E.2d 279, 284 (1963) ("where the defendant's exercise of due care ... is in issue, the jurisdiction in which the allegedly wrongful conduct occurred will usually have a predominant, if not exclusive, concern"); Bartlett v. Short Line Bus System, 330 N.Y.S.2d 945, 946-47, 69 Misc.2d 818, 819-20 (N.Y.Sup.Ct.1971), aff'd, 331 N.Y.S.2d 340, 38 A.D.2d 1008 (1972).
 
 
 10
 There is no difficulty in applying New Jersey law to the loss of the 16 drums. We are satisfied that on this record, Global is a warehouseman, and its failure to account for the goods is a conversion under New Jersey law; by New Jersey law in such cases no limitation of liability is effective. Although New Jersey's version of UCC Sec. 7-204, N.J.Stat.Ann. Sec. 12A:7-204(2), allows limitations of liability for warehousemen generally, it declares that "[n]o such limitation is effective with respect to warehouseman's liability for conversion to his own use."
 
 
 11
 N.J.Stat.Ann. 12A:7-102(1)(h) defines a warehouseman as "a person engaged in the business of storing goods for hire." We have no difficulty in concluding that Global's actions fall within that definition.
 
 
 12
 First, the drums were delivered several days before they were scheduled to be loaded aboard Dart ships, and were stored by Global. The Container Terminal Services Agreement, executed by Global and Dart, states that "Global is willing to provide ... for the rendition of stevedoring and terminal services for [Dart's] containers" (emphasis added). Global further agrees to make available to Dart, in addition to berths and staging areas for containers, "such use as may be required of the facilities of Global's adjacent consolidation and distribution shed." In response to Colgate's Interrogatory Number 14, which asks to "[s]tate where the goods were located or stored ...", Global answered "[t]he goods were stored in defendant Global's warehouse."
 
 
 13
 Nor is there any doubt that Global was compensated for these various services. The Container Services Agreement contains compensation clauses stating that Dart will pay Global on a vessel call basis, as well as a flat fee of $333,333.00 per year, payable in monthly installments.
 
 
 14
 Thus, we cannot agree with Global's contention that it was only a stevedore since, by its own admission, the goods were lost while stored in its warehouse. Global's Claims Manager himself described the functions of a marine terminal and stevedore in different terms.[6] When Colgate contended in its statement under local rule 3(g) that there is no genuine issue of fact as to the issue that "2. Defendant Global Terminal & Container Services, Inc. is a New Jersey corporation ... doing business as a warehouseman for hire," Global did not respond. Given the facts before us, we conclude that Global performed warehouseman services.
 
 
 15
 On the applicable law on conversion, a New York court would have no difficulty in concluding that there was a conversion of Colgate's goods by Global. The Supreme Court of New Jersey has never addressed this issue directly. Under New York law, in the absence of proof to the contrary, a New York court will assume that another state's common law is the same as its own. Zwirn v. Galento, 288 N.Y. 428, 432, 43 N.E.2d 474, 476 (1942); Read v. Lehigh Valley R.R. Co., 284 N.Y. 435, 441, 31 N.E.2d 891, 893 (1940); Weissman v. Banque de Bruxelles, 254 N.Y. 488, 173 N.E. 835 (1930). Under New York law, a warehouse that fails to provide an explanation for its failure to return stored property is liable for conversion. I.C.C. Metals Inc. v. Municipal Warehouse Co., 50 N.Y.2d 657, 431 N.Y.S.2d 372, 409 N.E.2d 849 (1980). The New York Court of Appeals declared "[i]t is not enough to show that defendants' bailee used reasonable care in its system of custody if mysterious disappearance is the only 'explanation' given." 50 N.Y.2d at 665 n. 3, 431 N.Y.S.2d 372, 409 N.E.2d 849 (citation omitted). The court, applying New York's version of U.C.C. 7-204, which is identical to New Jersey's, N.Y. Uniform Commercial Code 7-204 (McKinney 1964), struck down a limitation of liability contained by a warehouse receipt.
 
 
 16
 In addition, a lower court in New Jersey, in the only New Jersey case on this issue, recently endorsed the I.C.C. Metals approach. Reinfeld, Inc. v. Griswold & Bateman Warehouse Co., 189 N.J.Super. 141, 458 A.2d 1341 (1983). That being so, a New York court applying New Jersey law would look to the rule in I.C.C. Metals, and hold that Global's actions constituted a conversion. Thus, Global is liable as a warehouseman, under New Jersey law, for the conversion of the 16 drums of spearmint oil at their full value.
 
 
 17
 Reversed and remanded with instructions to enter judgment for the plaintiff in the amount of $116,459.24.
 
 VAN GRAAFEILAND, Circuit Judge, dissenting:
 
 18
 The issue on this appeal, as I view it, is not whether appellant's action against Global Terminal & Container Services, Inc. is within the federal maritime jurisdiction of the district court, but whether state or federal law controls when construing and applying the provisions of a bill of lading which was issued in interstate commerce. I believe that Congress has asserted its constitutionally accorded preeminence in this area and that federal law controls. See North Am. Phillips Corp. v. Emery Air Freight Corp., 579 F.2d 229, 233-34 (2d Cir.1978); Guinasso v. Pacific First Fed. Sav. & Loan Ass'n, 656 F.2d 1364, 1367 n. 7 (9th Cir.1981), cert. denied, 455 U.S. 1020, 102 S.Ct. 1716, 72 L.Ed.2d 138 (1982); National Garment Co. v. New York, C. & St. L.R. Co., 173 F.2d 32, 35 (8th Cir.1949); 49 U.S.C. Sec. 81.[1] Accordingly, I respectfully dissent.
 
 
 19
 In the exercise of its constitutional power to regulate interstate commerce, Congress enacted the Shipping Act of 1916, 46 U.S.C. Secs. 801-842. The Shipping Act closely parallels the Interstate Commerce Act in its general scope and purpose as well as in its terms, and "Congress intended that the two acts, each in its own field, should have like interpretation, application and effect." United States Navigation Co. v. Cunard Steamship Co., 284 U.S. 474, 480-81, 52 S.Ct. 247, 248-49, 76 L.Ed. 408 (1932). The passage of the Shipping Act was prompted in large measure by the report of the Alexander Committee,[2] which stated, among other things, that most of the shippers who testified before the Committee favored "a comprehensive system of government supervision ... [and]the approval of contracts, agreements, and arrangements, and the general supervision of all conditions of water transportation which vitally affect the interests of shippers." Alexander Report at 418, as quoted in Volkswagenwerk Aktiengesellschaft v. FMC, 390 U.S. 261, 275, 88 S.Ct. 929, 937, 19 L.Ed.2d 1090 (1968) (emphasis added by the Court). Section 1 of the Act, 46 U.S.C. Sec. 801, provides, therefore, that, when used in the Act, the term "other person subject to this chapter" means any person not included in the term "common carrier by water" who carries on the business of furnishing "wharfage, dock, warehouse, or other terminal facilities in connection with a common carrier by water."
 
 
 20
 Under section 17 of the Act, 46 U.S.C. Sec. 816, all those who are subject to the Act must "establish, observe, and enforce just and reasonable regulations and practices relating to or connected with the receiving, handling, storing, or delivering of property," United States v. American Union Transp., Inc., 327 U.S. 437, 449, 66 S.Ct. 644, 650, 90 L.Ed. 772 (1946), and the Federal Maritime Commission has the power to "stop effectively all unjust and unreasonable practices in receiving, handling, storing or delivering property," California v. United States, 320 U.S. 577, 584, 64 S.Ct. 352, 356, 88 L.Ed. 322 (1944). In carrying out the purposes of section 17, the Commission's power of enforcement is a broad one, which is not restricted to the regulatory provisions of the Act. New York Foreign Freight Forwarders & Brokers Ass'n v. FMC, 337 F.2d 289, 295-96 (2d Cir.1964), cert. denied, 380 U.S. 910, 85 S.Ct. 893, 13 L.Ed.2d 797 (1965).
 
 
 21
 Section 15 of the Act, 46 U.S.C. Sec. 814, requires that every person subject to the Act must file with the Commission a true copy of every agreement between that person and a common carrier by water which fixes or regulates transportation rates or which gives special rates, accommodations or other privileges. Since section 15 makes it unlawful to carry out such an agreement in whole or in part unless Commission approval is obtained, Congress hardly could have intended that the parties to an agreement were free to violate or ignore it after it was approved. Limitations of liability and cargo valuation are inherent parts of rates. North Am. Phillips Corp. v. Emery Air Freight Corp., supra, 579 F.2d at 232 (citing Western Union Tele. Co. v. Esteve Bros. & Co., 256 U.S. 566, 571-73, 41 S.Ct. 584, 586-87, 65 L.Ed. 1094 (1921), and Kansas City S. Ry. v. Carl, 227 U.S. 639, 653, 33 S.Ct. 391, 395, 57 L.Ed.2d 683 (1913)). Section 15's filing requirement, which is not restricted to agreements which "affect competition", Volkswagenwerk Aktiengesellschaft v. FMC, supra, 390 U.S. at 271-76, 88 S.Ct. at 935-37, is applicable to terminal operators. Id. at 280-82, 88 S.Ct. at 939-40; United States v. American Union Transp., Inc., supra, 327 U.S. at 451-54, 66 S.Ct. at 651-52; California v. United States, supra, 320 U.S. at 583-86, 64 S.Ct. at 355-56.
 
 
 22
 Finally, section 21 of the Act, 46 U.S.C. Sec. 820, empowers the Commission to require any person subject to the act to file "any periodical or special report, or any account, record, rate, or charge, or any memorandum of any facts and transactions appertaining" to such person's business.
 
 
 23
 "Port terminal facilities", as defined by the Commission, include "one or more structures comprising a terminal unit, and including, but not limited to wharves, warehouses, covered and/or open storage space, cold storage plants, grain elevators and/or bulk cargo loading and/or unloading structures, landings, and receiving stations, used for the transmission, care and convenience of cargo ... in the interchange of same between land and water carriers or between two water carriers." 46 C.F.R. Sec. 533.6(b). "Terminal services", as defined by the Commission, include "terminal storage", the providing of warehouse facilities for the storing of outbound cargo; "handling", the moving of cargo about the terminal facility; "loading", the service of loading cargo from the terminal to a means of conveyance from the facility; and "checking", the service of counting and checking cargo against appropriate documents for the account of the vessel. 46 C.F.R. Sec. 533.6(d).
 
 
 24
 Global Terminal & Container Services, Inc. was operating a port terminal facility and furnishing terminal services, and the district court so found. On March 31, 1972, Global entered into a twenty-year contract to provide these terminal services to Dart Containerline Co., an international shipping concern. Charges for the services were to be $333,333.00 per year, plus rates and charges to be billed to Dart on a vessel basis pursuant to a tariff filed by Global with the Commission. All cargo remaining in the terminal beyond the applicable "free time" was to be subject to demurrage charges in accordance with the provisions of Global's filed tariff. The contract also provided that Dart would name Global as an express beneficiary of all the limitation of liability provisions of its bills of lading. The contract between Global and Dart became effective upon its approval by the Commission.
 
 
 25
 Although the limitation of liability provisions of section 4(5) of the Carriage of Goods by Sea Act, 46 U.S.C. Sec. 1304(5), apply of their own force only to the period between loading and discharge, a carrier and shipper may agree to extend the limitation provisions to the period preceding loading, 46 U.S.C. Sec. 1307. See Miller Export Corp. v. Hellenic Lines, Ltd., 534 F.Supp. 707, 710 (S.D.N.Y.1982). Dart's bills of lading extended the $500 limitation of liability to the pre-loading period. They also provided, pursuant to the terms of the Commission-approved agreement between Global and Dart:
 
 
 26
 every exemption, limitation, conditions and liberty herein contained and every right, exemption from liability, defense and immunity of whatsoever nature applicable to the Carrier or to which the Carrier is entitled shall also be available and shall extend to protect every such servant or agent of the Carrier (including any stevedore, terminal operator or independent contractor) acting as aforesaid and for the purpose of all the foregoing provisions of this clause the Carrier is or shall be deemed to be acting as agent or trustee on behalf of and for the benefit of all persons who are or might be his servants or agents (including any stevedore, terminal operator or independent contractor as aforesaid) and all such persons shall to this extent be or be deemed to be parties to the contract in or evidenced by this bill of lading.
 
 
 27
 When appellant delivered its goods to the Global terminal, Global issued dock receipts "For the Master", which stated in bold type:
 
 
 28
 RECEIVED THE ABOVE DESCRIBED GOODS OR PACKAGES SUBJECT TO ALL THE TERMS OF THE UNDERSIGNED'S REGULAR FORM OF DOCK RECEIPTS AND BILL OF LADING WHICH SHALL CONSTITUTE THE CONTRACT UNDER WHICH THE GOODS ARE RECEIVED, COPIES OF WHICH ARE AVAILABLE FROM THE CARRIER ON REQUEST AND MAY BE INSPECTED AT ANY OF ITS OFFICES.
 
 
 29
 My reading of the law and the facts of this case satisfies me that, insofar as Colgate's shipments were concerned, Global's terminal facilities were subject to a broad and comprehensive scheme of federal regulation, see California v. United States, supra, 320 U.S. at 586, 64 S.Ct. at 356; Alabama Great S. R.R. Co. v. FMC, 379 F.2d 100, 102 (D.C.Cir.1967), and Greater Baton Rouge Port Comm'n v. United States, 287 F.2d 86, 89-92 (5th Cir.1961), cert. denied, 368 U.S. 985, 82 S.Ct. 600, 7 L.Ed.2d 523 (1962), and that, although section 1304(5) did not apply of its own force to the preloading period, the construction and application of the terms of Dart's bills of lading nonetheless were governed by federal law. I conclude, therefore, that appellant should not be permitted to disregard its agreement covering the use of Global facilities which was incorporated in the bills of lading and to proceed against Global as a warehouseman whose liability is governed solely by New Jersey's version of the Uniform Commercial Code. See Georgia, Fla. & Ala. Ry. v. Blish Milling Co., 241 U.S. 190, 197, 36 S.Ct. 541, 544, 60 L.Ed. 948 (1916); North Am. Phillips Corp. v. Emery Air Freight Corp., supra, 579 F.2d at 233-34; Miller Export Corp. v. Hellenic Lines, Ltd., supra, 534 F.Supp. at 711; G.A.C. Commercial Corp. v. Wilson, 271 F.Supp. 242, 247 (S.D.N.Y.1967). This conclusion, I believe, is supported by extensive authority in this and other Circuits and also by the express language of the New Jersey Act.
 
 
 30
 The seminal decision in this area of the law is Robert C. Herd & Co. v. Krawill Mach. Corp., 359 U.S. 297, 79 S.Ct. 766, 3 L.Ed.2d 820 (1959). In that case, the Court held that the provisions in an ocean carrier's bill of lading limiting its liability to $500 per package did not apply to or limit the liability of a negligent stevedore, because section 4(5), of the Carriage of Goods by Sea Act, 46 U.S.C. Sec. 1304(5), made no reference to stevedores or other agents of the carrier and the bill of lading involved there did not express a clear intent to limit the stevedore's liability. In so holding, the Court obviously implied that a stevedore's liability in tort could be limited by clearly worded language in a bill of lading. Id. at 305, 79 S.Ct. at 771.
 
 
 31
 Accordingly, we consistently have interpreted the Herd decision to mean that a bill of lading provision which expresses a clear intention to limit the liability of a carrier's agent, such as a stevedore or terminal operator, will be enforced for the benefit of the agent. The first post-Herd case so holding was Carle & Montanari, Inc. v. American Export Isbrandtsen Lines, Inc., 275 F.Supp. 76 (S.D.N.Y.1967), aff'd, 386 F.2d 839 (2d Cir.), cert. denied, 390 U.S. 1013, 88 S.Ct. 1263, 20 L.Ed.2d 162 (1968). That case was followed by Bernard Screen Printing Corp. v. Meyer Line, 464 F.2d 934 (2d Cir.1972), cert. denied, 410 U.S. 910, 93 S.Ct. 966, 35 L.Ed.2d 272 (1973), and has never been overruled. Thus, in Toyomenka, Inc. v. S.S. Tosaharu Maru, 523 F.2d 518, 520 (2d Cir.1975), we said, "It is axiomatic that parties to a bill of lading may extend the $500 limitation of liability to third parties." In Cabot Corp. v. S.S. Mormacscan, 441 F.2d 476, 478 (2d Cir.), cert. denied, 404 U.S. 855, 92 S.Ct. 104, 30 L.Ed.2d 96 (1971), we said that "there is no doubt that the parties to a bill of lading may extend a contractual benefit to a third party by clearly expressing their intent to do so." See also Schiess-Froriep Corp. v. S.S. Finnsailor, 574 F.2d 123, 127 (2d Cir.1978); Miller Yacht Sales, Inc. v. M.V. Vishva Shobha, 494 F.Supp. 1005, 1015 (S.D.N.Y.1980).
 
 
 32
 Our decision in Leather's Best, Inc. v. S.S. Mormaclynx, 451 F.2d 800 (2d Cir.1971), does not constitute authority to the contrary. In that case, the district court held that the terminal operator was "rendering services in connection with performance of this contract" as specified in the bill of lading and that its liability therefore was limited, as was that of the carrier, to $500 per package. 313 F.Supp. 1373, 1382-83 (S.D.N.Y.1970). On appeal, we held that the plaintiff had failed to satisfy its burden of proof as to the terminal operator's negligence, and we found it unnecessary to decide the limitation of liability issue. 451 F.2d at 814, 817. The district court, on remand, again considered that issue and held that the terminal operator was entitled to the benefit of the limitation of liability provision in the carrier's bill of lading. 346 F.Supp. 962, 968 (S.D.N.Y.1972).
 
 
 33
 Reference to the following cases will disclose that our interpretation of Herd has been adopted in most, if not all, of the Circuits which customarily pass upon shipping claims:
 
 Third Circuit
 
 34
 PPG Indus., Inc. v. Ashland Oil Co., 527 F.2d 502, 505-07 (3d Cir.1975);De Laval Turbine, Inc. v. West India Indus., Inc., 502 F.2d 259, 269-70 (3d Cir.1974).
 
 Fourth Circuit
 
 35
 La Salle Mach. Tool, Inc. v. Maher Terminals, Inc., 611 F.2d 56, 59-60 (4th Cir.1979);
 
 
 36
 Koppers Co. v. S/S Defiance, 542 F.Supp. 1356, 1364-67 (D.Md.1982), aff'd, 704 F.2d 1309 (4th Cir.1983);
 
 
 37
 Mediterranean Marine Lines, Inc. v. John T. Clark & Son, 485 F.Supp. 1330, 1334-37 (D.Md.1980).
 
 Fifth Circuit
 
 38
 Brown & Root, Inc. v. M/V Peisander, 648 F.2d 415, 422-25 (5th Cir.1981);
 
 
 39
 Secrest Mach. Corp. v. S.S. Tiber, 450 F.2d 285, 286-87 (5th Cir.1971);
 
 
 40
 Croft & Scully Co. v. M/V Skulptor Vuchetich, 508 F.Supp. 670, 673-75 (S.D.Tex.1981), aff'd in relevant part, 664 F.2d 1277 (5th Cir.1982);
 
 
 41
 Dorsid Trading Co. v. S/S Fletero, 342 F.Supp. 1, 6 (S.D.Tex.1972)
 
 Ninth Circuit
 
 42
 Tessler Bros. (B.C.) Ltd. v. Italpacific Line, 494 F.2d 438, 442 (9th Cir.1974)
 
 Eleventh Circuit
 
 43
 Certain Underwriters at Lloyds' v. Barber Blue Sea Line, 675 F.2d 266, 269-70 (11th Cir.1982).
 
 
 44
 The consistently similar holdings of the above cases should not be placed at naught by the provisions of a State-adopted Uniform Commercial Code. Section 7-103 of the Code, as adopted in both New York and New Jersey, provides "To the extent that any treaty or statute of the United States, regulatory statute of this State or tariff, classification or regulation filed or issued pursuant thereto is applicable, the provisions of this Article are subject thereto." The New Jersey Commission to Study and Report on the Uniform Commercial Code, in an Introductory Commentary by its Chairman, said that the Code "encompasses the entire law of documents of title to goods involved in intrastate transactions. Interstate and international shipments of goods are covered by Federal Law." 12A N.J.Stat.Ann., preceding Chap. 7 at 3. With specific reference to section 7-103, the Commentators said:
 
 
 45
 Section 7-103, therefore, states what is obvious: that federal law is paramount under the 'supremacy clause' of the United States Constitution where it constitutionally applies to a case also covered by state law.
 
 
 46
 12A N.J.Stat.Ann. Sec. 7-103, at 10.
 
 
 47
 This is a correct statement of the law. See Missouri Pac. R.R. Co. v. Elmore & Stahl, 377 U.S. 134, 137, 84 S.Ct. 1142, 1144, 12 L.Ed.2d 194 (1964); Iligan Integrated Steel Mills, Inc. v. SS John Weyerhaeuser, 507 F.2d 68, 73 n. 5 (2d Cir.1974), cert. denied, 421 U.S. 965, 95 S.Ct. 1954, 44 L.Ed.2d 452 (1975); National Garment Co. v. New York, C. & St. L.R. Co., supra, 173 F.2d at 35; M. & T. Trust Co. v. Export Steamship Corp., 262 N.Y. 92, 96-97, 186 N.E. 214 (1933). I believe that federal law is paramount in this case and that appellant cannot avoid the effect of this law and the clearly expressed provisions of the bill of lading by asserting its claim under the law of New Jersey. I would affirm.
 
 
 
 [1]
 Since Judge Duffy denied Colgate's motion for summary judgment, and since Global was not the sole defendant, the record was unclear as to whether this case was in an appealable posture. At oral argument, however, the parties agreed that Judge Duffy's ruling amounted to entry of judgment for Colgate in the amount of $8,000. Consequently, we treat this case as an appeal from final judgment
 
 
 [2]
 Of the 16 drums at issue, 13 were scheduled to leave for France on August 31, 1979. The dock receipt lists the exporting carrier as "D Canada." The remaining three drums were scheduled to leave on August 24, 1979, by exporting carrier "D America." On the bill of lading corresponding to the receipt, however, Canada is stamped over America. It is unclear whether this means all 16 were to leave on August 31. At most, the drums were all scheduled to leave for France within nine days after delivery to Global
 
 
 [3]
 The bills of lading for the drums at issue were all time stamped on or prior to August 22, 1979
 
 
 [4]
 Colgate's attempt to invoke diversity jurisdiction was unsuccessful. Colgate, a Delaware corporation, has its principal place of business in New York, and is therefore a citizen of New York as well. 28 U.S.C. 1332(c) (1976). Dart is a Bermuda corporation, and Global is a New Jersey corporation. Defendant Lansdell Protective Agency, Inc., however, is a New York corporation. Therefore, complete diversity is lacking
 
 
 [5]
 The dissent argues that Leather's Best supports affirmance in this case because on remand, the warehouse was allowed the $500 liability limitation. We disagree. In Leather's Best, we specifically held that the claim against Tidewater Terminal was a state claim for tortious conduct, but remanded because there was insufficient proof of negligence. On remand, negligence was proven, and the district court held that, under New York law, the $500 liability limitation was valid. Leather's Best, Inc. v. Tidewater Terminal, Inc., 346 F.Supp. 962, 968 (S.D.N.Y.1972). Our holding today is quite different; whereas the loss in Leather's Best occurred due to negligence, the loss here involves conversion by Global. It is only in cases of conversion that New Jersey (and New York) law invalidates liability limitations for warehousemen
 
 
 [6]
 Deposition of Haskell E. Deutsch, Claims Manager of Global:
 Q. Mr. Deutsch could you tell us what the business of Global Terminal is?
 A. Global is a marine terminal and stevedore.
 Q. Could you describe what a marine terminal does?
 A. A marine terminal handles oceangoing cargo, receives cargo. Like that.
 Q. What does a stevedore do?
 A. A stevedore works a vessel, takes containers or cargo off a ship, puts it on a ship.
 Q. And Global Terminal & Container Services, Inc. performs both of those functions?
 A. That's correct.
 
 
 [1]
 Section 81 provides that "[b]ills of lading issued by any common carrier for the transportation of goods ... from a place in a State to a place in a foreign country ... shall be governed by [the Federal Bill of Lading Act]."
 
 
 [2]
 House Comm. on Merchant Marine and Fisheries, Report on Steamship Agreements and Affiliations, H.R.Doc. No. 805, 63d Cong., 2d Sess. 415-24 (1914)