WEMHOENER PRESSEN,
Plaintiff–Appellant,

v.

CERES MARINE TERMINALS,
INCORPORATED, Defendant–
Appellee,

and

M/V TADEUSZ KOSCIUSZKO, her engines, boilers, etc., in rem; French–Polish Shipping Company; Polskie Linie Oceaniczne, Defendants.

No. 92–1885.

United States Court of Appeals,
Fourth Circuit.

Argued June 10, 1993.

Decided Sept. 13, 1993.

---

James Dygert Skeen, Wright, Constable & Skeen, Baltimore, argued, for appellant.

JoAnne Zawitoski, Semmes, Bowen & Semmes, Baltimore, argued, for appellee.

Before RUSSELL, Circuit Judge, SPROUSE, Senior Circuit Judge, and BRITT, United States District Judge for the Eastern District of North Carolina, sitting by designation.

## OPINION

BRITT, District Judge:

The issues before the court are whether the district court erred first in finding that federal maritime law applied to appellant Wemhoener Pressen's claim against appellee Ceres Marine Terminals, and then in deciding that the Himalaya clause in the bill of lading effectively extended to Ceres the $500 limitation of liability available to the carrier under the provisions of the Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C.App. § 1304(5). Ceres contends that the district court had federal maritime jurisdiction over all of Wemhoener's claims, including the claim against it, and that because delivery of the cargo had not yet occurred, the contractual extension of COGSA's limitation of liability was in full effect at the time of the damage to Wemhoener's cargo. Ceres argues further that the Himalaya clause is sufficiently specific to confer on Ceres the benefits of COGSA, which was incorporated into the bill of lading. We agree, and therefore affirm.

### I.

Wemhoener is a German corporation that manufactures and sells hydraulic presses for use in woodworking. It sold a press and related machinery to an Ohio business, IDI/PSC, and selected a forwarding agent, ICT Neuss, to ship the press to Ohio at the best price possible. Transportation involved putting the press into a crate and lashing it with steel cables onto a wheeled, non-motorized flatbed trailer called a "mafi." Mafis are used to transport cargo on roll-on, roll-off vessels. The mafi was owned by carrier Polskie Linie Oceaniczne (Polish Ocean Lines, or "POL"). Both the mafi and the crate were shipped across Germany to the German port of departure in Bremerhaven, where they were loaded onto the M/V Tadeusz Kosciuszko. The Express Cargo Bill [hereinafter Express Bill] accompanied the crate and served as the bill of lading. Shippers are entitled to avoid liability limitations if they so choose by entering the value of the goods in the space provided on the Express

Bill and by paying a higher price to ship the goods, but Wemhoener did not exercise this option. The space designated in the Express Bill as "value of goods declared of shipper" was left blank.

The M/V Tadeusz Kosciuszko took the mafi, crate attached, to the port of Baltimore. On November 30, 1989, the crate was unloaded from the ship by defendant Ceres's stevedores and transported to a storage area at the terminal, still strapped to the mafi. No rail cars were immediately available to take the crate to Ohio, so it remained in storage at the terminal until it could be shipped. The railcars were scheduled to arrive on December 12, 1989. On December 5, Ceres began to strip the crate from the mafi. A Ceres gearman used a cutting torch to remove the steel cables, which caused the packaging to catch fire and damaged both press and mafi. The cost of stripping the mafi (as well as for stripping other mafis) was billed by Ceres to POL pursuant to a written agreement between them, under which Ceres agreed to provide for POL a full range of stevedoring and terminal operation services for a set fee. *Id.* at 64, 67, 85–86. Ceres's personnel loaded the damaged press onto a rail car on December 13, 1989 and billed that service to John A. Steer, Inc., "as agents" for the Ohio buyer. *Id.* at 89, 90. The press was received by IDI/PSC on December 28, 1989. Despite repair attempts, it now operates at 70% efficiency. Wemhoener claims that the press had an invoice value of over one million dollars and that components valued at $350,-000 were damaged by the fire.

On November 26, 1990, Wemhoener sued the vessel [1] that transported the crate and mafi, POL, and Ceres. As to defendant Ceres, the Complaint alleged that jurisdiction was premised on admiralty and maritime jurisdiction and on diversity jurisdiction. The Complaint did not specifically allege negligence but stated that Ceres had "agreed to handle, transport and deliver [the cargo] as a terminal operator or bailee to the consignee in as good order and condition as received, but on receipt by the consignee, said cargo was not in as good order as received by Ceres, but seriously injured and damaged."

---

1. The vessel was never arrested and is not involved in this litigation.

In its appellate brief, however, Wemhoener characterized the basis of its claim against Ceres. as "negligent and improper handling of Wemhoener's property [in Ceres's capacity] as a terminal operator."

Both POL and Ceres moved for partial summary judgment on grounds that the liability of each was limited to $500 per package. In response, Wemhoener conceded that POL was liable only for $500 based on § 1304(5) of COGSA, which stipulates that the carrier shall not be liable for over $500 per package unless, prior to shipping, the shipper declares a higher value for the goods in the bill of lading. However, Wemhoener contended then and now that Ceres cannot claim benefit of the $500 per package limitation. Ceres asserts that it can, based on the "Himalaya" clause in POL's North America Service Bill of Lading [hereinafter "America Bill"], which was incorporated into the terms of the Express Bill.[2] The Himalaya clause is set out in Section II of the America Bill as follows:

9. Sub-contracting and Indemnity.

(1) The Carrier shall be entitled to subcontract on any terms the whole or any part of the carriage.

(2) The Merchant undertakes that no claim or allegation shall be made against *any person whomsoever by whom the Carriage or any part of the Carriage is per-*

*formed or undertaken* (other than the Carrier) which imposes or attempts to impose upon any such person or any vessel owned by any such person any liability whatsoever in connection with the Goods whether or not arising out of negligence on the part of such person and if any claim or allegation should nevertheless be made to indemnify the carrier against all consequences thereof. Without prejudice to the foregoing *every such person shall have the benefit of all provisions herein benefitting the Carrier as if such provisions were expressly for his benefit;* and in entering into this contract, the Carrier, to the extent of these provisions, does so not only on his own behalf, but also as agent and trustee for such persons.

According to the definitions set out in Section I, the Merchant is Wemhoener, the Carrier is POL, and Carriage "means the whole of the operations and services undertaken by the carrier in respect of the goods."

Based on the language of the Himalaya clause and also on clauses 23 and 24[3], Ceres argued in its motion for partial summary judgment that while cutting the cables, stripping the crate from the mafi and preparing the crate for rail transport, it was performing parts of the carriage as a subcontractor for POL and that it therefore was, under the Himalaya clause, entitled to the carrier's

---

2. The Express Bill states that it incorporates and is subject to the provisions of POL's North America Service Bill of Lading and POL's applicable tariff. Paragraph Five of the Express Bill states:

> It is agreed that *the custody and carriage of the goods are subject to the terms stated on the face and back hereof and also to all definitions, terms, and conditions contained in the carrier's North America Service Bill of Lading,* as well as carrier's applicable tariff which shall be deemed to be incorporated in this Express Cargo Bill. Such terms shall govern the relations, whatsoever they shall be, between the Merchant ... and the carrier, master and ship in every contingency wheresoever and whensoever occurring and whether the carrier be acting as bailee, warehouseman or in any other relation whatever....

(J.A. at 51 (emphasis added).) The first paragraph also stipulates that the Express Bill is provided "for the convenience of the Merchant, but is nevertheless subject to all the definitions, terms and conditions of the carrier's North America Service Bill of Lading (copies of which

are available on request for inspection) as well as carrier's applicable Tariff." *Id.*

3. Clauses 23 and 24 provide:

> 23. Package Limitation. In the case of any loss or damage in connection with goods exceeding in value the equivalent of $500.— lawful money of the United States per package, ... the value of the goods shall be deemed to be $500.— per package.... The Carrier's liability, if any, shall be determined on the basis of the value of $500.— per package ...

unless the nature of the goods and a valuation higher than $500. per package ... shall be declared in writing by the shipper upon delivery to the Carrier and inserted in the Bill of Lading and an extra charge paid....

> 24. Period of Responsibility. In case the enactment evidenced by this Bill of Lading is subject to the Carriage of Goods by Sea Act, the provisions stated in said Act shall govern before loading and after discharge and troughout [sic] the entire time the goods are in the Carrier's custody.

COGSA benefits. The district court agreed. In the Memorandum accompanying his Order, Chief United States Magistrate Judge Clarence E. Goetz declined to address the state law issue "inasmuch as the court, exercising federal maritime jurisdiction, holds that the COGSA limitation of liability extends to Ceres in this case." *Id.* at 138. The court determined that federal maritime law applied, despite its concurrent diversity jurisdiction, based on the facts and on precedent developed in this circuit. *Id.* at 135–36; *see B. Elliott (Canada) Ltd. v. John T. Clark & Son,* 704 F.2d 1305 (4th Cir.1983), *aff'g* 542 F.Supp. 1367 (D.Md.1982); *Rockwell Int'l Corp. v. S/S Koeln Express,* 1987 A.M.C. 2541, 1987 WL 33398 (D.Md.1987). The court found that "the action which caused the damage, i.e., the stripping of the cargo from the mafi, is a peculiarly maritime activity, inasmuch as mafis are intended solely to facilitate shipboard loading and unloading, which fact links the activity even more closely to the maritime shipping process." (J.A. at 135–36.) After concluding that the damage did occur during carriage, the court turned to Wemhoener's claim of ambiguity and stated that "[t]o the contrary, the court finds that the clause clearly is intended to extend the benefits of the bill of lading to all subcontractors engaged in the carriage of goods which, in this case, the court finds to include defendant Ceres." *Id.* at 136. After discounting Wemhoener's argument that Second Circuit Court of Appeals precedent should control its disposition of the motion and disagreeing with Wemhoener's characterization of prevailing case law in that circuit, *id.* at 136–37, the court granted partial summary judgment to Ceres and limited its liability to $500. Wemhoener filed a motion to reconsider, which was denied, and judgment of $500 subsequently was entered for Wemhoener against both POL and Ceres. Wemhoener then appealed to this court.

## II.

We turn first to the issue of whether the district court erred by applying federal maritime law to Wemhoener's claim against Ceres. Paragraphs one and two of the Complaint read as follows:

1. This is a case of admiralty and maritime jurisdiction as hereinafter more fully appears, and is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure.

2. As to Defendant, Ceres Marine Terminals, Inc., this is also a case of pendent and diversity jurisdiction, the amount in controversy being in excess of Fifty Thousand Dollars . . . .

*Id.* at 5. Wemhoener now argues that the district court did not have federal maritime jurisdiction over its claim against Ceres. It states that only diversity supported the court's jurisdiction, and for that reason, its claim should have been reviewed under Maryland state law. According to Wemhoener, the contractual incorporation of COGSA's limitation of liability conflicts with Maryland law disallowing limitations without a warehouse receipt or in instances of gross negligence, such that the asserted limitation is invalid. Ceres argues in response that state law is irrelevant but that in any event, the bill of lading *is* a warehouse receipt under the Maryland U.C.C. To the extent that the contractual extension of COGSA and Maryland law may conflict, Ceres argues, "the services of stevedores and terminal operators are a part of a pervasive scheme of federal law and regulation which should not be preempted" by state law.

## A.

The bill of lading is a contract between the shipper and the carrier and "continues to govern the rights and obligations of the parties until delivery." *B. Elliott,* 704 F.2d at 1307 (citing Grant Gilmore and Charles Black, Jr., *The Law of Admiralty* § 3–1 (2d ed. 1975); *David Crystal, Inc. v. Cunard S.S. Co.,* 339 F.2d 295, 297 (2d Cir. 1964), *cert. denied,* 380 U.S. 976, 85 S.Ct. 1339, 14 L.Ed.2d 271 (1965)). The bill of lading for the damaged press, because it was issued in international trade, is governed by the terms of COGSA. 46 U.S.C.App. § 1300. "By its own terms, COGSA only 'covers the period from the time when the goods are loaded on to the time they are discharged from the ship,' but parties to a bill of lading may contract to extend the time period prior

to loading and after discharge." *B. Elliott,* 704 F.2d at 1307 (quoting 46 U.S.C.App. § 1301(e)). The bill of lading at issue in this case purports to extend the benefits of COGSA to the carrier's subcontractors to the extent that they perform portions of the carriage, which may take place prior to loading and after discharge. With respect to this portion of the carriage, as we noted in *B. Elliott,* the Harter Act specifically applies. *Id.* Under the Harter Act, the "manager, agent, master or owner of any vessel" transporting goods between the United States and a foreign port may not insert into the bill of lading any provision to absolve it from liability for "loss or damage arising from negligence, fault or failure in proper loading, stowage, custody, care, or proper delivery of any and all … property committed to its or their charge." 46 U.S.C.App. § 190. However, the Harter Act does not preclude limitations of liability. To the extent that the Harter Act pertains to aspects of carriage covered by COGSA, the provisions of COGSA prevail. To portions of the carriage that take place prior to loading or after discharge and therefore are not covered by the terms of COGSA, the Harter Act controls. *B. Elliott,* 704 F.2d at 1307 (noting that Harter Act "covers the period after discharge until delivery"); *see also, e.g., Allstate Ins. Co. v. Imparca Lines,* 646 F.2d 166, 168 (5th Cir. 1981). Thus, the issues before the court must be decided with reference to the bill of lading and both statutes.

Wemhoener urges the court to look to a fourth source of authority—Maryland state law. According to Wemhoener, federal maritime law does not extend to negligent actions taken on land by terminal operators. It conceded that Ceres could be entitled to COGSA's limitation of liability if the damage occurred during the course of Ceres's stevedoring activities, but contends that when Ceres stripped the crate from the mafi it was acting purely as a terminal operator and therefore could not limit its liability. Under Maryland law, Wemhoener argues, Ceres occupied the position of a warehouseman, did not issue a warehouse receipt, and therefore cannot limit its liability. *See* Md.Com.Code Ann. §§ 7–204(1), (2) (1957). Alternatively, Wemhoener contends that Ceres was grossly negligent and for that reason cannot, consistent with Maryland law, limit its liability. In sum, Wemhoener's argument is that COGSA benefits conferred on third parties to the bill of lading are unenforceable to the extent that they are in conflict with state law.

### B.

The preliminary issue of whether state law need even be consulted is the source of disparate treatment among the circuits. The leading case in support of Wemhoener's position is *Colgate Palmolive Co. v. S.S. Dart Canada,* 724 F.2d 313 (2d Cir.1983), *cert. denied sub nom. Global Terminal & Container Svcs. v. Colgate Palmolive Co.,* 466 U.S. 963, 104 S.Ct. 2181, 80 L.Ed.2d 562 (1984). In *Colgate,* the Second Circuit Court of Appeals stated that in cases where the COGSA limitation has been extended by contract, "COGSA does not apply of its own force as a statute, but merely as a contractual term in the bill of lading." *Id.* at 315. "Since state law governs," the *Colgate* court continued, "provisions of COGSA incorporated by contract can be valid only insofar as they do not conflict with applicable state law." *Id.* at 315–16. Pursuant to this reasoning, the terminal operator in *Colgate* was not entitled to limit its liability because it had converted the property and New Jersey law did not allow liability limitation in cases of conversion. *Id.* at 316–17. The *Colgate* decision was not unprecedented: In 1971, the Second Circuit found in *Leather's Best v. S.S. Mormaclynx,* 451 F.2d 800, 808 (2d Cir. 1971), that "an action against a terminal operator for negligent loss of cargo is not within federal maritime jurisdiction, but is a state claim governed by state law." *Colgate,* 724 F.2d at 315 (construing *Leather's Best,* 451 F.2d at 808).

Other circuits, including this one, have viewed the issue differently. Looking first to our own precedents, we turn to *B. Elliott (Canada) Ltd. v. John T. Clark & Son,* 704 F.2d 1305 (4th Cir.1983). *Elliott* was a diversity case and clearly envisioned application of federal maritime law to claims of negligent damage to cargo by terminal operators insofar as it dealt with similar facts and made no reference to state law. We ex-

plained in *B. Elliott* that "[b]ecause delivery under the bill of lading and under the Harter Act had not yet taken place when the damage to the cargo occurred, the bill of lading continued to govern the rights and obligations of the parties at the time the damage to the cargo occurred." *Id.* at 1308.

*B. Elliott* was decided contemporaneously with *Koppers Co. v. S/S Defiance,* 704 F.2d 1309 (4th Cir.1983). In *Koppers,* we considered whether a terminal operator, Clark, was acting as an agent of the carrier at the time damage to the cargo occurred, such that Clark was entitled to limit its liability under a bill of lading that incorporated COGSA. We found that Clark was entitled to limit its liability because, as in *B. Elliott,* delivery of the cargo had not yet occurred when the terminal operator negligently damaged the cargo. *Id.* at 1312. Accordingly, the bill of lading governed the rights and obligations of the parties. *Id.* Reviewing facts remarkably similar to those presently before the court, we noted that the cargo had been unloaded from the ship without incident and taken to defendant's container yard for overnight storage. Clark billed this service to the carrier as part of its "stevedoring operations." The cargo was damaged the next day when Clark attempted to move it to Shed Number 4, where it would be stripped from its "flat rack" container (which was owned by the carrier) and prepared for loading onto an overland trailer for ultimate delivery to the buyer. Clark also billed the carrier for these services, classified by Clark as "terminal operations." *Id.* at 1311. On these facts, we found that Clark clearly was the carrier's agent and therefore was entitled to limit its liability.

In both *Koppers* and *B. Elliott,* we looked only to federal law to determine parties' rights and obligations arising under contractual extensions of COGSA but made no findings explicitly precluding application of state law. We recognized but declined to address that exact issue in *La Salle Machine Tool, Inc. v. Maher Terminals, Inc.,* 611 F.2d 56 (4th Cir.1979), because the district court and

parties agreed that the same result would be reached under either federal or state law. For that reason, we did not "determine whether state or federal law governs the particular issues on this appeal." *Id.* at 57 n. 1. In this case, we review *de novo* the trial court's grant of partial summary judgment. We conclude that we must address Wemhoener's state law claim only if we first determine that state law applies, and so turn first to that issue.

 For reasons to follow, we hold that contractual incorporations of COGSA into foreign bills of lading should be construed according to federal law.[4] In so holding, we reject the approach taken by the Second Circuit in *Colgate,* 724 F.2d 313, and incorporated into a Maryland district court decision cited to the court by Wemhoener, *Ferrex Int'l v. M/V Rico Chone,* 718 F.Supp. 451, 456 (D.Md.1988) (relying on *Colgate* ). So long as the bill of lading is still governed by COGSA or the Harter Act, which includes the period of time after discharge of the goods but prior to delivery, the rights and obligations of third party beneficiaries under a Himalaya clause should be determined with reference to the bill of lading, not state law, even if state law is inconsistent. This holding does not conflict with our recognition in *Commonwealth Petrochemicals, Inc. v. S/S Puerto Rico* that "when COGSA does not apply of its own force but is incorporated into a maritime contract by reference, it does not have 'statute rank'; rather, it is merely part of the contract, a term like any other." 607 F.2d 322, 325 (4th Cir.1979). In *Commonwealth,* the court was reviewing a contract of domestic carriage which purported to incorporate COGSA. *Id.* at 325–27. In contrast, in the *B. Elliott* and *Koppers* companion cases, we recognized carriers' agents' ability to limit their liability in foreign bills of lading. The difference is not insignificant: Unlike domestic bills of lading, the foreign bill of lading is within district courts' admiralty jurisdiction by virtue of both COGSA and the Harter Act. Further, the contract of carriage embodied by the bill represents the

---

4. Whether contractual incorporation of COGSA in *domestic* shipping contracts is subject to state or federal law is not before us.

parties' intentions at the time the contract was made. So long as it remains in effect, it should be interpreted according to its terms and without reference to the varying state laws of this nation's many ports.

In so holding, we join a number of other courts that also have viewed the arena of international maritime transport best left to the regulation of Congress. Most courts apparently have assumed, without deciding, that contractual extensions of COGSA are to be construed according to the terms of the bill of lading and without reference to state law. *See, e.g., Barretto Peat, Inc. v. Luis A. Ayala Colon Successors, Inc.,* 896 F.2d 656 (1st Cir.1990); *Generali v. D'Amico,* 766 F.2d 485 (11th Cir.1985); *Gebr. Bellmer KG. v. Terminal Servs. Houston, Inc.,* 711 F.2d 622 (5th Cir.1983); *see also Colgate,* 724 F.2d at 319–20 (Van Graafeiland, J., dissenting) (arguing that defendant's terminal facilities "were subject to a broad and comprehensive scheme of federal regulation ... and that, although section 1304(5) [of COGSA] did not apply of its own force to the pre-loading period, the construction and application of the terms of [the carrier's] bills of lading nonetheless were governed by federal law").

In *Barretto Peat,* the district court had dismissed the plaintiff-seller's complaint because it was instituted after expiration of Puerto Rico's one-year statute of limitation for tort actions, including conversion, and the one-year limitation in COGSA, 46 U.S.C.App. § 1303(6). The district court also refused to allow plaintiff to add a claim for breach of contract, which had a fifteen-year statute of limitations. The action was brought outside the one-year but within the fifteen-year statute. On appeal, the appellate court reviewed the Puerto Rican statutes pertaining to conversion and breach of contract, decided that the district court did not err in refusing to allow plaintiff to add the contract claim, and concluded that plaintiff's action still would have been time-barred because "given the applicability of COGSA [to the foreign bill of lading at issue], [plaintiff] cannot circumvent COGSA's operation by couching its complaint in terms of conversion or breach of contract." *Barretto Peat,* 896 F.2d at 661 (citing *Miller Export Corp. v. Hellenic Lines, Ltd.,* 534 F.Supp. 707 (S.D.N.Y.1982) (holding that "COGSA controls [shipper's claim against carrier] even though the purported fraud or negligence is alleged to have occurred prior to loading or subsequent to discharge")). In an Eleventh Circuit case, *Generali v. D'Amico,* an insurer brought suit against the carrier and its agent, a stevedoring firm, for negligent damage to cargo. The court found, without even considering state law, that it was "well settled that parties to a bill of lading may contractually extend limitation of liability benefits to non-carriers and agents of the carrier" and that the parties had, in fact, successfully done so. 766 F.2d at 490; *see also Gebr. Bellmer,* 711 F.2d 622 (extending benefit of Himalaya clause to terminal agent without reference to state law).

We also take note that passage of COGSA was prompted by the congressional aim of ensuring uniformity in international maritime commerce. COGSA was enacted in 1936 to embody the American version of an international convention known as the Hague Rules. By subjecting all foreign bills of lading to COGSA, Congress afforded to international shippers and carriers a greater degree of certainty and uniformity in their dealings. And, by permitting those parties to contractually extend application of COGSA to the periods prior to loading and after unloading but before delivery, Congress authorized shippers and carriers to place all of their dealings under COGSA, if they so intend. To hold that this contractual extension of COGSA, to which both shipper and carrier have agreed, may be measured against the state law of the port in which the cargo may be damaged could undercut these protections and would offer to sellers and shippers the benefit of additional legal theories and remedies for which they had not bargained. Certainly, it would not give effect to what we perceive as Congress' intent.

### III.

Having determined that federal law applies until delivery, we now review the facts to ascertain whether delivery had occurred at the time the cargo was damaged. "Proper delivery" for Harter Act purposes means

either actual or constructive delivery. Actual delivery consists [of] completely transferring the possession and control of the goods from the vessel to the consignee or his agent. Constructive delivery occurs where the goods are discharged from the ship upon a fit wharf and the consignee receives due and reasonable notice that the goods have been discharged and has a reasonable opportunity to remove the goods or put them under proper care and custody. . . .

B. *Elliott*, 704 F.2d at 1308 (quoting *Orient Overseas Line, Inc. v. Globemaster Baltimore, Inc.*, 33 Md.App. 372, 365 A.2d 325, 335–36 (1976)). The Act establishes the minimum requirements, but parties are free to contract for further obligations. In those instances, courts must also look to the language of the contract of carriage. In this case, "delivery" is defined in the America Bill as "delivering the goods to or placing the goods at the disposal of the party entitled to receive them." (J.A.Supp. sec. I.2.)

■ The record shows that at the time of the damage, Ceres had custody of the goods pursuant to its contract with POL. Under that contract, Ceres provided stevedoring and terminal operator services for POL. These services included unloading the vessels, storing the cargo until it could be sent to its final destination, and then loading the cargo onto a truck or railcar, as appropriate. Wemhoener contends that POL's carriage of the cargo ended and Harter Act delivery occurred when the cargo was placed on the pier by Ceres and the consignee was notified that it was ready to be received by the inland rail carrier.[5] Specifically, Wemhoener argues that "[i]n cutting the cables on the crate as a terminal operator in preparation for loading the cargo on the railcars, a service which is charged to the consignee and clearly not 'carriage' under the bill of lading, Ceres was performing a service after Harter delivery and delivery as defined in the bill of lading and therefore does not fall within the definition of a person performing a part of the carriage." (Appellant's Br. at 13.) However, as Ceres correctly points out, the act of

stripping the mafis actually was charged to the carrier POL, not the consignee.

We conclude that Wemhoener's cargo was not "at the disposal" of the consignee and was not ready to be received by the inland carrier until *after* it had been stripped from POL's mafi. We agree with the district court that when Ceres cut the cables holding the press onto the mafi, it was acting as POL's subcontractor and was fulfilling POL's contractual responsibility for carriage of the goods until delivery. At the time of damage to the press, then, neither actual nor constructive delivery had taken place.

## IV.

■ This court's final inquiry is whether the district court made an error of law in finding that the Himalaya clause was sufficiently particular to extend to Ceres the $500 per package limitation of liability. All parties agree that POL was entitled to the limitation, and that the contract purports to extend that protection through the Himalaya clause to "any person whomsoever by whom the Carriage or any part of the Carriage is performed or undertaken." "Carriage" is defined in the contract as "the whole of the operations and services undertaken by the carrier in respect of the goods." (J.A. Supp. sec. I.2.) Wemhoener argues that the language must be "crystal" clear and unambiguous and concludes that in this case, the language fails to meet the standard of clarity set out by the Supreme Court in *Robert C. Herd & Co. v. Krawill Mach. Corp.*, 359 U.S. 297, 305, 79 S.Ct. 766, 771, 3 L.Ed.2d 820 (1959).

In *Herd*, the Court held that COGSA did not apply to stevedores of its own force, but that the parties who are covered by COGSA (shippers and carriers) may contractually extend its application to "stevedores or other agents of the carrier for damages caused by their negligence." *Id.* at 302, 79 S.Ct. at 769. The Court cautioned that

contracts purporting to grant immunity from, or limitation of, liability must be strictly construed and limited to intended beneficiaries, for they "are not to be applied to alter familiar rules visiting liability

5. The record does not disclose when notification was sent to or received by the consignee.

upon a tortfeasor for the consequences of his negligence, unless the clarity of the language used expresses such to be the understanding of the contracting parties." *Id.* at 305, 79 S.Ct. at 771 (quoting *Boston Metals Co. v. The Winding Gulf,* 349 U.S. 122, 123–24, 75 S.Ct. 649, 650, 99 L.Ed. 933 (1955) (concurring opinion)).

In the instant case, the Himalaya clause defines third party beneficiaries as subcontractors who take part in performance of the carriage. We find it perfectly clear that the Himalaya clause is intended to benefit POL's subcontractor Ceres; the clause itself states that it inures to the benefit of "any person whomsoever *by whom the Carriage or any portion of the Carriage is performed or undertaken.*" Similar language has been found adequate by other courts. In *Generali v. D'Amico,* the Eleventh Circuit Court of Appeals concluded that the term "bailee" was sufficiently descriptive and emphasized that the

> "clarity of language" requirement does not mean that COGSA benefits extend only to parties specifically enumerated in the bill of lading. "It is sufficient that the terms express a clear intent to extend benefits to a *well-defined class of readily identifiable persons.* When a bill refers to a class of persons such as agents or independent contractors, it is clear that the contract includes all *those persons engaged by the carrier to perform the functions and duties of the carrier within the scope of the carriage contract.* No further degree of clarity is needed."

766 F.2d at 490 (quoting *Certain Underwriters at Lloyd's v. Barber Blue Sea Line,* 675 F.2d 266, 270 (11th Cir.1982)) (emphasis added).

The district court also concluded, and we agree, that stripping the cargo from a mafi is a "peculiarly maritime activity." *See Caterpillar Overseas, S.A. v. Marine Transport Inc.,* 900 F.2d 714, 726 (4th Cir.1990). In *Caterpillar,* we reasoned that to determine whether an independent contractor qualifies as a third-party beneficiary of a Himalaya clause, the court must "take into consideration 'the nature of the services performed compared to the carrier's responsibilities un-

der the carriage contract.'" *Id.* (quoting *Taisho Marine & Fire Ins. Co. v. The Vessel "Gladiolus",* 762 F.2d 1364, 1367 (9th Cir. 1985)). We found that the subcontractor in *Caterpillar* was ineligible under the Himalaya clause not because the damage took place merely "on land," as Wemhoener argues, but because the trucking firm's "entire operation was non-maritime [and] carried out without the terminal premises" and because the reference in the Himalaya clause to independent contractors could not be construed to apply to a trucking company that damaged the goods while transporting them down a public highway, selected by its agents. *Id.* In sum, *Caterpillar* is readily distinguishable from the case presently before us.

Already having determined that the damage occurred during carriage and prior to delivery, we conclude that the Himalaya clause is sufficiently specific to confer its benefits on those persons who, as agents of the carrier, perform services necessary to carry out POL's obligation to complete carriage of the goods. "Carriage" can only pertain to activities related to the transport of the goods from the time the cargo is committed to the custody of the carrier to the point of delivery, at which time the carriage is complete. We find that at the time it damaged the cargo, Ceres was acting as POL's agent and was, under the terms of the bill of lading, entitled to the contractually incorporated benefits of COGSA.

## V.

For the foregoing reasons, we conclude that state law does not control federal courts' interpretations of foreign bills of lading that incorporate the provisions of COGSA into Himalaya clauses and affirm the judgment of the district court.

***AFFIRMED.***